**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**BRETT LORENZO FAVRE**                                                          **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO.: 2:23-CV-00042-KS-MTP**

**SHANNON SHARPE**                                                              **DEFENDANT**

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS**

Defendant Shannon Sharpe moves to dismiss the Complaint under Rule 12(b)(6).

**INTRODUCTION**

In this defamation action, retired NFL Hall of Fame quarterback Brett Favre has sued
Shannon Sharpe, an NFL Hall of Fame tight end and the co-host of a daily sports debate show,
over opinions Sharpe expressed on his show about Favre's widely-reported involvement in the
Mississippi welfare fraud scandal. In discussing news reports that Favre improperly obtained
welfare funds for the construction of a volleyball facility at Favre's alma mater (where Favre's
daughter was a member of the volleyball team), Sharpe expressed his opinions on the reported
conduct, stating that: "you've got be a sorry mofo to steal from the lowest of the low" and "Brett
Favre is taking from the underserved" and "[Favre] stole money from people who really needed
that money."

Favre does not dispute the disclosed factual basis for Sharpe's commentary—a *Mississippi
Today* news article explicitly cited on the cable television show. Nor can Favre deny that the State
of Mississippi has sued him in a lawsuit to recoup misspent welfare funds, that he returned welfare
money he received for services not performed, that he has been interviewed by the FBI, and that
his alleged misconduct has been extensively set forth in many publicly available court documents
and widely covered in news stories. Rather, Favre's claim depends solely on the assertion that

Sharpe defamed him by offering the opinion that Favre, by engaging in this widely-reported conduct, "stole" or was "taking" from the needy and underserved of Mississippi and was thus "a sorry mofo."

But Sharpe's opinions—commentary based on reported facts and couched in rhetorical hyperbole regarding an issue of public concern about a public figure—lie at the core of the protections afforded by the First Amendment and Mississippi law.  Sharpe's comments are not actionable, and the Complaint is irreparably defective on its face.  Moreover, Favre failed to comply with Mississippi law concerning the filing of defamation claims.  Favre's claims should be dismissed for three reasons.

*First*, Sharpe's commentary challenged here is a classic example of the rhetorical hyperbole and loose, figurative language entitled to full protection from liability under the First Amendment. In the context of the public welfare fraud proceedings being reported, any reasonable viewer would have understood Sharpe's colorful language to reflect his subjective, personal views, not literal statements of fact.  As such, the challenged statements cannot support a defamation claim as a matter of law.

*Second*, Mississippi law protects Sharpe's right to make caustic and critical comments on Favre's involvement in a matter of public concern: the misspending of welfare funds intended for poor Mississippi families. Viewed in the context of the broadcast as a whole, each of the challenged statements unmistakably reflects Sharpe's opinions based on disclosed and publicly reported information.  As a matter of law, Sharpe's opinionated comments cannot be actionable defamation.

*Third*, Favre failed to meet the most basic prerequisite to bringing a defamation claim— Mississippi's retraction statute, Miss. Code Ann. § 95-1-5. This statute requires plaintiffs to send a retraction demand ten days before suing. Favre's failure to comply with that statute provides an independent ground for dismissal.

For these reasons, and as detailed below, Favre's defamation complaint is incurably defective and should be dismissed with prejudice.

## FACTS

Favre's defamation claim arises from Sharpe's comments made during one segment of the September 14, 2022, broadcast of a daily sports cable television show. During that segment, Sharpe and his co-host expressed their views on Favre's publicly reported role in a massive Mississippi welfare fraud scandal. The challenged segment discussed the widespread public reports that were the subject of the hosts' commentary. Among other things, the segment referred specifically to, and quoted from, a news article by *Mississippi Today* that reported on an ongoing civil lawsuit related to the welfare fraud scheme and Favre's involvement in the scandal and ensuing litigation.[1]

---

[1] The Court may consider the *Mississippi Today* article in deciding this Motion because it was referenced and quoted in the broadcast that is the subject of this Complaint and is therefore "integral" to Favre's claim. *Meyers v. Textron, Inc.*, 540 Fed. Appx. 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (court considering a 12(b)(6) motion "may take into account documents incorporated into the complaint by reference or integral to the claim"); *Donald J. Trump for President, Inc. v. WP Co. LLC*, No. CV 20-626 (RC), 2023 WL 1765193, at *1 n.1 (D.D.C. Feb. 3, 2023) (news articles explicitly relied on in the challenged publications were "integral" to plaintiff's claim); *Hayne v. The Innocence Project*, 2011 WL 198128, at *2 (S.D. Miss. Jan, 11, 2011) (when press releases attached to a 12(b)(6) motion were referenced in the Complaint and central to the plaintiff's claims, "the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated") (citation omitted).

The Court may also properly consider any other matters of which the Court may take judicial notice pursuant to Fed. R. Evid. 201 (Judicial Notice of Adjudicative Facts). *See Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022); *George v. SI Group, Inc.*, 36 F.4th 611, 619 (5th Cir. 2022). These documents include the public record materials cited throughout this section, the publicly available filings from other lawsuits, newspaper articles, and government press releases. Defendant offers these materials not for the truth of the matter asserted, but to demonstrate the information that was "in the public realm" and available to Defendant at the time of the comments that are the subject of the Complaint.  *See, e.g.*, *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (filings in other lawsuits); *SeaHorn Invs., LLC v. Goodman Mfg. Co., L.P.*, 2015 WL 13091130, at *3 (S.D. Miss. Dec. 28, 2015) (same), *aff'd sub nom. Seahorn Invs., L.L.C. v. Goodman Mfg. Co., L.P.*, 667 F. App'x 452 (5th Cir. 2016); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (judicial filings and news articles); *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (news articles).

### A.  The Mississippi Welfare Fraud Scandal

The factual backdrop of this lawsuit is one of the largest public fraud scandals in Mississippi history. The Mississippi Office of the State Auditor determined that more than $77 million dollars in federal Temporary Assistance for Needy Families ("TANF") funds were misspent.[2] According to an independent forensic audit commissioned by the Mississippi Department of Human Services, and as widely reported in the news media, funds intended for the poor were diverted from their statutory purpose of helping needy Mississippi families and instead were improperly directed to politically connected persons.[3]

The welfare scandal has resulted in significant criminal charges. To date, six individuals have pled guilty to state or federal felonies, or both, related to their involvement in the scandal, including the former Executive Director of the Mississippi Department of Human Services, four executives of non-profit organizations that spent tens of millions of dollars in welfare funds, and a retired professional wrestler.[4]

---

[2] *See* Press Release, Mississippi Office of the State Auditor, Auditor Demands Repayment of Misspent Welfare Money – Multiple Audits Now Confirm Millions of Dollars Intended for the Poor Were Spent Illegally (Oct. 12, 2021), https://www2.osa.ms.gov/news/auditor-demands-repayment-of-misspent-welfare-money/#more-2355, attached to Defendant's Motion as Exhibit "A".

[3] *Id.*

[4] *See* March 16, 2023 Minute Entry, *United States v. Webb*, Case No. 3:23-cr-21-CWR-FKB-1 (S.D. Miss.); March 2, 2023 Minute Entry, *United States v. DiBiase*, Case No. 3:23-cr-14-CWR-FKB-1 (S.D. Miss.); September 22, 2022 Minute Entry, *United States v. Davis*, Case No. 3:22-cr-104-CWR-FKB-1 (S.D. Miss.); April 20, 2022 Minute Entry, *United States v. New*, Case No. 3:21-cr-00028-CWR-FKB-1 (S.D. Miss.); April 20, 2022 Minute Entry, *United States v. New*, Case No. 3:22-cr-00053-CWR-FKB-1 (S.D. Miss.); *Mississippi v. McGrew*, Case No. 25CI1:20-cr-00051-AHW-1, MEC Docket Nos. 24, 25 (Hinds Co. Cir. Ct.).

PD.41895201.2

Mississippi also has filed a civil lawsuit seeking to recover the misspent welfare dollars from Favre and his company, Favre Enterprises, along with many others.[5] According to the State's initial complaint, filed in May 2022, Favre personally received $1.1 million dollars in TANF funds for speaking engagements that he never performed.[6] In response, Favre repaid the money to the State.[7] Then, in December 2022, the State amended its complaint to seek repayment of an *additional* $5 million in TANF funds that Favre helped to secure to satisfy his personal guarantee to fund construction of a volleyball facility at the University of Southern Mississippi ("USM"), where Favre is an alumnus and his daughter was a member of the volleyball team.[8] After failing to secure the necessary funds from his own connections, the State alleges, Favre turned to a non-profit responsible for distributing State welfare funds and ultimately secured a grant of $5 million in TANF funds to fund the volleyball facility.[9] In short, the State's Complaint alleges that Favre caused state welfare funds to be diverted from their statutory purpose of serving the State's needy and directed instead toward building a volleyball facility for his daughter's college volleyball team.

---

[5] *See* Complaint in *Mississippi Department of Human Services v. Mississippi Community Education Center, Inc., et al.*, Case No. 25 CI 1:22-cv-00286-EFP, Docket No. 2 (Hinds Cty. Cir. Ct. May 9, 2022), attached to Defendant's Motion as Exhibit "B".

[6] *Id.* at ¶¶ 137-138.

[7] *See* First Amended Complaint in *Mississippi Department of Human Services v. Mississippi Community Education Center, Inc., et al.*, Case No. 25 CI 1:22-cv-00286-EFP, Docket No. 197 (Hinds Cty. Cir. Ct. December 13, 2022) at ¶ 105, attached to Defendant's Motion as Exhibit "C".

[8] *Id.* at ¶¶ 82-112, 298, 325.

[9] *Id.*

PD.41895201.2

On April 24, 2023, the Judge in the case denied Favre's motion to dismiss the State's claims against Favre in the amended complaint.[10]

The welfare scandal—and Favre's role in it—have generated substantial media attention. Favre's involvement in the scandal first broke on February 27, 2020, in a *Mississippi Today* article, "Embattled welfare group paid $5 million for new USM volleyball center."[11] Since then, local and national news organizations have reported extensively on the ongoing developments in the welfare scandal, including specifically Favre's involvement in it.[12]

Of particular significance here, on September 13, 2022, *Mississippi Today* published a news article discussing a recent filing in the State's lawsuit that revealed numerous text messages between Favre and others relating to the funding of the USM volleyball facility.[13] The *Mississippi Today* article analyzed the recent court filing and concluded that the newly released texts "show that [Favre and others] worked together to channel at least $5 million of the state's welfare funds

---

[10] *See* Hinds County Circuit Court Order Denying Defendant Brett Lorenzo Favre's Motion to Dismiss the Amended Complaint, Case No. 25 CI 1:22-cv-00286-EFP, Docket No. 352 (Hinds Cty. Cir. Ct. April 24, 2022), attached to Defendant's Motion as Exhibit "D".

[11] *See* Anna Wolfe, *Former Gov. Embattled welfare group paid $5 million for new USM volleyball center*, MISSISSIPPI TODAY, Feb. 27, 2020, https://mississippitoday.org/2020/02/27/welfare-program-paid-5-million-for-new-volleyball-center/, attached to Defendant's Motion as Exhibit "E".

[12] *See, e.g.*, *Auditor: Brett Favre Received $1.1M In Welfare Funds For Speeches He Never Gave*, CBS NEWS, May 4, 2020, https://www.cbsnews.com/minnesota/news/auditor-brett-favre-received-1-1m-in-welfare-funds-for-speeches-he-never-gave/?intcid=CNM-00-10abd1h; Ken Dilanian & Laura Strickler, *The nation's poorest state used welfare money to pay Brett Favre for speeches he never made*, NBC NEWS, Sept. 1, 2022, https://www.nbcnews.com/politics/politics-news/nations-poorest-state-used-welfare-money-pay-brett-favre-speeches-neve-rcna45871; *Former Mississippi governor helped Brett Favre obtain welfare funds for university volleyball stadium, texts show*, ESPN, Sept. 13, 2022, https://www.espn.com/nfl/story?id=34588657&_slug_=former-mississippi-governor-helped-brett-favre-obtain-welfare-funds-university-volleyball-stadium-texts-show, attached to Defendant's Motion as Exhibit "F". These articles are representative of the many publicly reported stories on Favre's involvement in the welfare scandal.

[13] *See* Anna Wolfe, *Former Gov. Phil Bryant helped Brett Favre secure welfare funding for USM volleyball stadium, texts reveal*, MISSISSIPPI TODAY, September 13, 2022, https://mississippitoday.org/2022/09/13/phil-bryant-brett-favre-welfare, attached to Defendant's Motion as Exhibit "G".

PD.41895201.2

to build a new volleyball stadium at the University of South Mississippi, where Favre's daughter played the sport," and that "a separate $1.1 million welfare contract Favre received to promote the program—the subject of many national headlines—was simply a way to get more funding to the volleyball project."

According to the article, Favre also texted Nancy New, the former president of a non-profit which received and distributed TANF funds and who has since pled guilty to state and federal criminal charges related to her role in the welfare fraud scandal: "'I could record a few radio spots,' Favre texted [to] . . . [Nancy] New, according to the new filing, '. . .  and whatever compensation could go to USM.'"[14]

The article also included an image of the following text messages between Favre and New regarding the welfare funds:[15]

---

[14] *Id.* (September 13, 2022, *Mississippi Today* Article).

[15] *Id*. (September 13, 2022, *Mississippi Today* Article).

PD.41895201.2



## B. Sharpe's Comments Challenged by Favre

Shannon Sharpe is a retired NFL Hall of Fame tight end who currently co-hosts a daily live sports talk show on cable television with sports personality Skip Bayless, *Skip and Shannon: Undisputed* ("*Undisputed*"). Sharpe and Bayless are the show's commentators, providing colorful, passionate, and sometimes heated opinions on recent sporting events and sports-related news for two-and-a-half hours every morning.

Favre's Complaint against Sharpe arises out of an eleven-minute segment on the September 14, 2022, episode of *Undisputed* (the "Broadcast").[16] In discussing the welfare scandal on the Broadcast, moderator Jennifer Hale opened the segment with an accurate recap of the *Mississippi Today* news article from the day before:

---

[16] *See* Complaint in *Brett Lorenzo Favre v. Shannon Sharpe*, ECF Document No. 1-2, attached to Defendant's Motion as Exhibit "H".

PD.41895201.2

> Yesterday, an investigation by *Mississippi Today* found that Brett Favre, along with the help of a former Mississippi Governor, obtained welfare funds to help build a new volleyball Center at the University of Southern Mississippi.[17]

Favre has not challenged or sued over this statement or alleged that it is false.

After the Broadcast's moderator reported this latest news, she turned to Sharpe for his views.[18] Sharpe responded by expressing his views on the publicly reported allegations against Favre, and Favre has sued Sharpe over only three comments from the Broadcast:

- "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low."[19]

- "Brett Favre is taking from the underserved."[20]

- "[Favre] stole money from people that really needed that money."[21]

Sharpe expanded on the basis for his comments. Reading aloud the text messages between Favre and Nancy New that were quoted in the *Mississippi Today* article, Sharpe observed: "This is what Brett Favre texted, 'If you were to pay me, is there any way the media can find out where it came from and how much?"[22] Favre does not dispute that he sent this text.

---

[17] *See* Video Disc of September 14, 2022, Episode of *Undisputed* at 00:03-00:15 attached to Defendant's Motion as Exhibit "I" For the Court's convenience, Certified Transcript of the Broadcast at 2, attached to Defendant's Motion as Exhibit "J".

[18] *See* Exhibit "I" at 00:16-00:19 (video); Exhibit "J" at 2 (transcript).

[19] *See* Exhibit "H" at ¶ 18 (Complaint); Exhibit I" (video) at 00:48-00:57; Exhibit "J" at 3 (transcript).

[20] *See* Exhibit "H" at ¶ 18 (Complaint); Exhibit "I" (video) at 01:04-01:09; Exhibit "J" at 4 (transcript).

[21] *See* Exhibit "H" at ¶ 18 (Complaint); Exhibit "I" (video) at 01:52-01:55; Exhibit "J" at 5 (transcript).

[22] *See* Exhibit "I" at 01:14-01:21 (video); Exhibit "J" at 4 (transcript).

PD.41895201.2

Sharpe and his co-host then turned to discussing the State's ongoing civil lawsuit against Favre and others involved in the welfare fraud scandal, with Sharpe's co-host noting that: "the Mississippi Department of Human Services had to file a civil lawsuit against Brett Favre because he had not paid back the interest he owed on the 1.1 million that he was fraudulently given for giving no speeches."[23] Favre does not dispute this fact.

The segment closed with the show's moderator commenting that "Yahoo Sports reports that the FBI is looking into [the allegations at issue] and has actually questioned Brett Favre already about it."[24] Favre disputes none of this.

## C. This Lawsuit

Several months after the Broadcast, on February 3, 2023, Favre's counsel sent a letter to Sharpe, seeking a retraction of Sharpe's comments on the Broadcast.[25] That letter demanded retraction within five (5) days, or Favre would "promptly commence legal action."[26] Six days later, on February 9, 2023, Favre filed this lawsuit in Mississippi state court. Sharpe removed the case to this Court.

**STANDARD OF REVIEW**

A complaint that fails to sufficiently state a claim upon which relief can be granted must be dismissed under Federal Rule of Civil Procedure 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), where there are well-pleaded factual allegations, a court shall then determine whether such allegations plausibly give rise to entitlement to relief. *See Ashcroft v. Iqbal*, 556 U.S.

---

[23] *See* Exhibit "I" (video) at 03:05-03:20; Exhibit "J" at 7-8 (transcript).

[24] *See* Exhibit "I" (video) at 10:50-10:56; Exhibit "J" at 22 (transcript).

[25] *See* Exhibit "H" at ¶¶ 6, 29 (Complaint).

[26] *See* February 3, 2023, Letter from Kasowitz Benson Torrese, LLP, attached to Defendant's Motion as Exhibit "K".

662, 678-79 (2009). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Conclusory statements do not support a defamation claim. *Beauchene v. Miss. Coll.*, 986 F. Supp. 2d 755, 766 (S.D. Miss. 2013) (dismissing defamation claim).

The "nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit." *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988), *aff'd*, 865 F.2d 664 (5th Cir. 1989); *see also Cooper v. Paragon Sys., Inc.*, No. 08-169, 2008 U.S. Dist. LEXIS 67761, at *3 (S.D. Miss. Sept. 5, 2008). Courts considering a motion to dismiss a defamation claim will "routinely" address "issues such as whether the statement at bar is capable of a defamatory meaning, …. whether it is protected opinion, and whether the suit is barred by privilege." *Mitchell*, 703 F. Supp. at 1258 n.10 (citation omitted). Dismissal of defamation suits for failure to state a claim occurs "with relative frequency." *Id.* (dismissing with prejudice).[27]

## ARGUMENT AND AUTHORITY

I.      **As a Matter of Law, Sharpe's Rhetorical Hyperbole and Figurative Expressions about Favre Are Protected Speech that Cannot Support a Defamation Claim.**

The First Amendment protections in defamation cases are rooted in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964). Consistent with this principle,

---

[27] *See also Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("summary proceedings are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails") (internal quotations and citation omitted).

"loose, figurative" language and "rhetorical hyperbole" relating to matters of public concern "receive full constitutional protection." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20-21 (1990); *see also Letter Carriers v. Austin,* 418 U.S. 264, 284-286 (1974) (use of "traitor" in describing a union "scab" was not a basis for a defamation action because it was used "in a loose, figurative sense" that was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

Protection of such robust and colorful commentary provides "assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20-21. Consistent with these principles, courts routinely dismiss defamation claims based on statements using figurative language and rhetorical hyperbole—even where the statements at issue, taken *literally*, are untrue or accuse the plaintiff of a serious crime.  For example, the Supreme Court has held that a defendant's use of the term "blackmail" to describe the plaintiff's conduct was not defamatory because "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable," and thus "imposition of liability on such a basis was constitutionally impermissible." *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14 (1970); *see also Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (television host calling plaintiff an "accomplice to murder" was nonactionable rhetorical hyperbole "expressing his belief that [plaintiff] shared in the moral culpability for [an individual's] death, not as a literal assertion that [plaintiff] had, by his actions, committed a felony"); *Mattel, Inc. v. MCA Records, Inc*., 296 F.3d 894, 908 (9th Cir. 2002) (terms "bank robber," "heist," "crime" and "theft" are nonactionable "rhetorical hyperbole."); *Montgomery v. Risen*, 875 F.3d 709, 71 (D.C. Cir. 2017) (characterization of software sold to the government as a "hoax" is too "loose, figurative or hyperbolic" to be

considered defamatory); *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 (1st Cir.1992), *cert. denied,* 504 U.S. 974 (1992) (describing theatrical touring production as a "rip-off, a fraud" was not actionable defamation).

Mississippi courts also recognize that such language is constitutionally protected. *See Perkins v. Littleton*, 270 So. 3d 208, 217–18 (Miss. Ct. App. 2018) ("the First Amendment protects 'imaginative expression' or 'rhetorical hyperbole'" and "no reasonable listener would have understood the radio ad's brief reference to Perkins as charging him with a crime" by using the word "conspiracy").[28]

The statements identified in the Complaint— "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low;" "Brett Favre is taking from the underserved [in Mississippi];" and "[Favre] stole money from people that really needed that money"—are classic examples of constitutionally-protected rhetorical hyperbole and loose, figurative language.

As is now established through government investigations, forensic audits, civil litigation, Favre's text messages, and Favre's own implicit admission through his returning of $1.1 million dollars to the State, the money obtained by Favre for himself and USM came from welfare funds. The funds may have come from the State of Mississippi, but they were intended to go to poverty-stricken families, not to fund the construction of a college volleyball facility.  In that context, just as the Supreme Court has held that saying a negotiator engaged in "blackmail" or calling a non-union employee a "traitor" is constitutionally-protected rhetorical hyperbole and loose, figurative language, Sharpe's use of the words "steal," "taking," and "stole" in connection with Favre's

---

[28] Similarly, the law of Mississippi is that "name calling and verbal abuse are to be taken as statements of opinion, not fact, and therefore will not give rise to an action for libel." *Johnson v. Delta-Democrat Pub. Co.*, 531 So. 2d 811, 814 (Miss. 1988) (collecting cases); *see also Curtis v. Birdsong*, 360 F.2d 344, 348 (5th Cir. 1966) ("those bastards" not defamatory under Alabama law).

actions is non-actionable speech. *See Greenbelt,* 398 U.S. at 14; *Letter Carriers*, 418 U.S. at 284-286.  In the same way, Sharpe's comments that Favre took from "people that really needed that money," the "lowest of the low," and "the underserved," again are examples of protected, colorful speech referring to needy families in Mississippi.

Here, even the most careless viewer of the Broadcast would have recognized Sharpe's statements as rhetorical hyperbole—robust language used to express Sharpe's strong views about the new information that emerged about Favre's participation in the welfare saga. As any reasonable viewer can tell from watching the Broadcast, *Undisputed* is a debate format sports entertainment talk show, and Sharpe's comments are properly seen in that context as constitutionally-protected speech. *See Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996) (sports "columnists frequently offer intemperate denunciations of coaches' play-calling or strategy, and readers know this and presumably take such railings with a grain of salt").

As the Supreme Court has explained, loose, hyperbolic speech on matters of public concern is non-actionable because statements "must be provable as false before there can be liability under state defamation law." *Milkovich,* 497 U.S. at 19.  Whether Favre is a "sorry mofo" obviously cannot be proven true or false. And characterizing Favre's actions as "stealing" "from the lowest of the low" in the context of Favre returning over a million dollars in welfare funds—money intended for the disadvantaged—is exactly the kind of figurative rhetoric that courts have routinely held should not be taken literally, lest we chill the "uninhibited, robust, and wide-open" speech that the First Amendment was designed to protect and does protect here. Courts across the country have found comparable examples of rhetorical hyperbole to be shielded from liability as a matter of state and federal constitutional law.  *See e.g., Greenbelt,* 398 U.S. at 14; *Letter Carriers*, 418 U.S. at 284-286; *Horsley,* 292 F.3d at 702; *Mattel,* 296 F.3d at 908.

Because Sharpe's comments are constitutionally protected rhetorical language and are not defamatory as a matter of law, Favre's Complaint must be dismissed.

## II.     As a Matter of Law, the Complaint Fails to State a Defamation Claim Because Sharpe's Opinions Were Based on a Disclosed Factual Premise.

Favre's defamation claim fails because it seeks to impose liability upon opinions Sharpe offered concerning disclosed and publicly reported information—the allegations made against Favre by the State of Mississippi in court proceedings and the conduct discussed in public press reports, including the *Mississippi Today* article referenced in the Broadcast.

Statements of opinion are actionable in defamation "only if they clearly and unmistakably imply the allegation of **undisclosed** false and defamatory facts as the basis for the opinion." *Ferguson v. Watkins*, 448 So. 2d 271, 275-76 (Miss. 1984) (emphasis added). When the underlying factual basis of an allegedly defamatory opinion is disclosed, "contemptuous language" and "unfair" criticism cannot be defamatory. *Ferguson*, 448 So. 2d at 273.  As the Mississippi Supreme Court explained in *Blake v. Gannett Co.*, no claim for defamation will lie where the facts "in th[e] article leave, to the reader, the role of accepting or rejecting the appellees' opinion." 529 So. 2d 595, 605 (Miss. 1988); *see also Engler v. Winfrey*, 201 F.3d 680, 688 (5th Cir. 2000) (opinion supported by a disclosed "factual premise" cannot be defamatory because "the expression of opinions as well as facts is constitutionally protected so long as a factual basis underlies the opinion"); *Mann v. City of Tupelo,* No. 1:93-cv-107-B-D, 1995 WL 1945433, *12 (N.D. Miss. April 13, 1995) (company manager's statement that company wanted to see the plaintiff prosecuted for her actions was non-actionable opinion because it was based on disclosed facts).[29]

---

[29] The 5th Circuit and other courts also have recognized this established principle of defamation law.  *See, e.g., Church of Scientology v. Cazares*, 638 F.2d 1272, 1289 (5th Cir. 1981) (calling church a "rip-off" not defamatory as a matter of law because underlying facts were provided) (Florida law); *Foote v. Sarafyan*, 432 So. 2d 877, 880 (La. App. 4th Cir. 1982) (defendant's "harsh opinion" that plaintiff committed "payroll fraud" was based on "publication of the underlying facts" and thus, non-defamatory opinion).

Historically, the "fair comment privilege" of Mississippi defamation law has broadly protected editorial commentary such as Sharpe's when the underlying factual basis pertained to public affairs. *See Edmonds v. Delta Democrat Pub. Co.*, 93 So. 2d 171, 173–74 (Miss. 1957) (citation omitted) (editorial "was fair comment because it gave to the reader the factual basis for the critical comments, . . . the criticism was in the form of opinions of the editorial writer; and it related to a matter in which the public had a valid and lively interest.").

In evaluating the statements at issue, the alleged "defamatory communications of television media defendants . . . are considered in the context of the entire broadcasted news report." *See Gales v. CBS Broad., Inc.*, No. Civ.A.5:03-CV-35(BR), 2004 WL 1961680, at *5 (S.D. Miss. July 9, 2004); *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) ("The said-to-be-offending words must be set in the context of the entire utterance. Their complexion draws color from the whole."). If a court concludes that the challenged statements, viewed in context, "amount to nothing more than the [speaker's] opinion," the claim must be dismissed. *Mitchell*, 703 F. Supp. at 1257 n.9 (dismissing defamation claim with prejudice).

Sharpe's comments about Favre's reported involvement in the welfare scheme, expressed in critical and at times contemptuous terms, in the midst of a spirited discussion on a cable sports debate show, are textbook examples of protected opinions with a disclosed factual basis. Reasonable viewers know that on cable news, "pundits debat[e] the latest political controversies" and provide "pitched commentary," which is nonactionable opinion protected by the First Amendment rather than "factual representations." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184 (S.D.N.Y. 2020) (Tucker Carlson Tonight); *Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1050 (S.D. Cal. 2020) (Rachel Maddow Show).

Hosts are "widely known" for offering "unrehearsed and unscripted" opinions addressing "controversial current topics of public interest and debate." *Behr v. Weber*, 172 A.D. 2d 441, 443

16

(N.Y. App. Div. 1991). Consistent with the Mississippi Supreme Court's decision in *Ferguson*, 448 So. 2d at 276, in the context of an editorial, even "statements which might otherwise be viewed as assertions of fact may take on an entirely different character" as protected opinion, *Brian v. Richardson*, 660 N.E. 2d 1126, 1130 (N.Y. 1995) (statements in article on op-ed page were non-actionable).

Mississippi's welfare fraud scandal, a matter of public concern, was already the subject of widespread media coverage and public discussion at the time the Broadcast aired. Moreover, the context of the entire Broadcast makes clear that Sharpe was expressing his personal views on Favre based on disclosed information about the welfare scandal. That is exactly what viewers expect from a former NFL player such as Sharpe on a sports and entertainment show – his opinions and commentary based on news reporting by others.

At the start of the Broadcast, the moderator "clearly and unmistakably" informed viewers of the reported factual basis for Favre's involvement in the welfare scandal, through explicit reference to the *Mississippi Today* article published the day before.[30] *Mann*, 1995 WL 1945433, at *12. She then turned the program over to Sharpe and his fellow commentator to express their opinions on those reported facts.[31] Sharpe and his co-host not only expressed their opinions, including the three disputed comments here, but also provided the underlying factual basis supporting their opinion, including Favre's own text messages, the State's civil lawsuit against Favre to recover misspent welfare funds, and references to the reporting of others, including *Mississippi Today* and Yahoo Sports.[32]

---

[30] *See* Exhibit "I" (video) at 00:02-00:15; Exhibit "J" at 2 (transcript).

[31] *See* Exhibit "I" (video) at 00:16-00:20; Exhibit "J" at 2 (transcript).

[32] *See* Exhibit "I" (video) at 00:1:14-01:35, 03:05-03:26, 05:55-07:08, 07:42-07:54, 00:10:49-11:07; Exhibit "J" at 4, 7-8, 13-15, 17, 22 (transcript).

PD.41895201.2

Thus, the Broadcast gave viewers the reported factual basis of the scandal from *Mississippi Today* and other news outlets, along with airing the strong views of Sharpe and his co-host about the latest revelations.

Moreover, Sharpe's comments are entitled to further protection under state law because the disclosed factual basis for Sharpe's comments was drawn from official proceedings.  Under Mississippi law, statements concerning official proceedings are shielded from defamation liability so long as, "when considered in context, it is clear that the [challenged statements are] quoting, paraphrasing or otherwise drawing upon official documents or proceedings." *Pittman v. Gannett River States Pub. Corp.,* 836 F.  Supp. 377, 384-85 (S.D. Miss. 1993) (privilege applied even though the defendant "was merely recounting the prosecutor's statements" and the plaintiff denied the charges against him).

Whether the official proceedings privilege applies to a particular publication is a matter for the court to decide. *See McDonald v. Raycom TV Broad., Inc.*, 665 F. Supp. 3d 688, 690 (S.D. Miss. 2009) (citing *Pittman,* 836 F. Supp. at 382).  That Sharpe's comments were "drawing upon official documents or proceedings" is clear from the face of the Broadcast. The Broadcast "clearly and unmistakably" disclosed the underlying factual basis supporting Sharpe's comments, which included primary reporting by *Mississippi Today* and other news outlets, as well as official proceedings such as the State's lawsuit against Favre. *Mann*, 1995 WL 1945433, at *12.

At the time of Sharpe's comments, the State alleged that Favre received over one million dollars of diverted welfare funds for speeches that he purportedly never made.[33] Further, other documents entered into the record during the State's lawsuit, including the text messages that were imaged in the *Mississippi Today* article, indicated that Favre was involved in the diversion of other

---

[33] *See* Exhibit. "B" at ¶¶ 137-38 (Complaint in *Mississippi Department of Human Services v. Mississippi Community Education Center, Inc., et al.*, Case No. 25 CI 1:22-cv-00286-EFP, Docket No. 2 (Hinds Cty. Cir. Ct. May 9, 2022)

welfare funds toward the construction of USM's new volleyball facility. Sharpe's vigorous comments that Favre was "steal[ing]" or "taking" from the needy families of Mississippi was explicitly drawing upon the State's widely publicized allegation that Favre received diverted welfare funds. Here, as in *Pittman*, "the public was aware that numerous official hearings and proceedings had taken place prior to [Sharpe's commentary]," and there can be little doubt that the viewers of the Broadcast, who are the "intended beneficiaries of the privilege," would have "logically realized that the previously published articles and official proceedings were the sources for the alleged defamatory remarks." *Id*. And as in *Pittman*, permitting the claims to proceed would "sap the vigor from public debate." *Id*., 836 F. Supp. at 382.

There is absolutely "nothing in the [Broadcast] that implies" that Sharpe's observations were "based upon facts known only" to Sharpe. *Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265, at *9 (E.D.N.Y. Oct. 25, 2019), *aff'd*, 2020 WL 3864950 (2d Cir. July 9, 2020). The Mississippi Supreme Court has recognized that this kind of "sharp commentary is simply not actionable libel." *Lawrence v. Evans,* 573 So. 2d 695, 699 (Miss. 1990); *see Ferguson*, 448 So. 2d at 276 ("Caustic commentary" is not actionable.). In *Ferguson*, for example, the plaintiffs faced "searing commentary" by a newspaper columnist, and the Court held the statements "are an opinion [the columnist] had the right to express. They are not libelous." *Id*. at 272-73, 276. Similarly, Sharpe's strongly worded opinions about Favre simply cannot give rise to a defamation action as a matter of law.

### III.     Plaintiff Failed to Comply with the Mississippi Retraction Statute.

Before a defamation complaint can be filed against a media defendant, it is a mandatory that the plaintiff first comply with the requirements of the Mississippi retraction statute.  *See* Miss. Code Ann. § 95-1-5; *Brocato v. Mississippi Publishers Corp.*, 503 So. 2d 241, 242–43 (Miss. 1987). Mississippi federal courts have long held that the state's retraction statute applies broadly to defamation claims involving a

wide range of media, including cable broadcasts. *See Pannell v. Associated Press*, 690 F. Supp. 546, 549 n.2 (N.D. Miss. 1988) (applying Miss. Code Ann. § 95-1-5 to "the Associated Press wire service and other forms of news reporting services such as news magazines and ***cable*** and satellite transmissions") (emphasis added). The statute requires "at least ten (10) days" notice for a retraction to be made before an action can be filed. Miss. Code Ann.  § 95-1-5(1).  The "language of § 95–1–5 is clear and unambiguous" that the plaintiff "shall, at least ten (10) days before instituting any such action, serve notice in writing on the defendant." *Brocato*, 503 So. 2d at 243.

Favre seems to have recognized the need to demand a retraction, but inexplicably failed to adhere to the Mississippi statute, instead choosing to file suit only six days after sending the notice. Favre's retraction letter is dated February 3, 2023, and this suit was filed on February 9, 2023.[34] Mississippi courts uniformly hold that failure to serve the statutory notice is grounds for dismissal. *See King v. Mississippi*, No. 3:14-cv-157-CWR-FKB, 2015 WL 370175, at *4 n.11 (S.D. Miss. Jan. 27, 2015) (failure to comply with retraction statute); *McLaurin v. Melton*, 1994 WL 739671, at *1 (S.D. Miss. 1994) ("regardless of whether WAPT defamed the plaintiff, his cause is barred by failure to comply with the aforementioned requirements"). For example, in *Brocato*, the plaintiff had not complied with the ten-day notice period, but instead filed suit eight days after notice, which the Court found did not meet the statutory requirement. 503 So. 2d at 243.[35]  That same result is required here. Favre's failure to comply with the "clear and unambiguous" language of Section 95-1-5 requires dismissal of this suit. *Id*.

---

[34] See Exhibit "K" (February 3, 2023, Letter from Kasowitz Benson Torres, LLP).

[35] Mississippi strictly enforces similar pre-suit notice requirements. *See Long v. Memorial Hosp. at Gulfport*, 969 So. 2d 35, 41 (Miss. 2007) (discussing strict compliance for ninety-day pre-suit notice requirement in Mississippi Tort Claims Act).

PD.41895201.2

## CONCLUSION

For the foregoing reasons, Sharpe's Motion to Dismiss should be granted and Favre's Complaint must be dismissed with prejudice.

Dated: May 3, 2023                           Respectfully submitted,

                                             BY: */s D. Michael Hurst, Jr.*

D. Michael Hurst, Jr. (MSB 99990)
James W. Shelson (MBN 9693)
Mark Fijman (MBN 99153)
PHELPS DUNBAR, LLP
4270 I-55 North
Jackson, Mississippi 3911-6391
Telephone: (601) 352-2300
Email: mike.hurst@phelps.com
          jim.shelson@phelps.com
          mark.fijman@phelps.com

Mary Ellen Roy, T.A. (LA Bar #14388)
(*pro hac vice*)
PHELPS DUNBAR, LLP
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Email: maryellen.roy@phelps.com

Joseph M. Terry (D.C. Bar #473095)
(*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
Telephone: (202) 434-5000
Email: jterry@wc.com

**ATTORNEYS FOR DEFENDANT SHANNON SHARPE**

## <u>CERTIFICATE OF SERVICE</u>

I, D. Michael Hurst, Jr., do hereby certify that on May 3, 2023 I electronically filed this

***MEMORANDUM IN SUPPORT OF MOTION TO DISMISS*** with the Clerk of the Court using

the CM/ECF system which sent notification of such filing to all counsel of record.

This the 3rd day of May, 2023.

/s D. Michael Hurst, Jr.

D. Michael Hurst, Jr.

PD.41895201.2