# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

BRETT LORENZO FAVRE                                                     PLAINTIFF

VS.                                                 CIVIL ACTION NO. 2:23-cv-00042-KS-MTP

SHANNON SHARPE                                                         DEFENDANT


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ................................................................................................................ 3

A.     Favre Retires From the NFL And Devotes Time To Business And Charitable Endeavors 3

B.     MDHS Files Suit Concerning The TANF Program And Its Misuse Of Funds Through MCEC ................................................................................................. 4

C.     Sharpe Defames Favre And Favre Files Suit .................................................. 6

ARGUMENT ........................................................................................................ 7

I.     SHARPE'S STATEMENTS ARE ACTIONABLE AND NOT PROTECTED BY THE FIRST AMENDMENT ................................................................................. 8

       A.     The Statements Are Assertions Of Fact And Not Rhetorical Hyperbole ............... 8

       B.     Sharpe's Statements Are Not Protected Opinions On A Disclosed Factual Premise ................................................................................................. 13

       C.     Sharpe's Statements Are Not Privileged Reports Of An Official Proceeding...... 20

II.    NOTICE OF SUIT WAS NOT REQUIRED ..................................................... 22

CONCLUSION...................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*AirTran Airlines, Inc. v. Plain Dealer Pub. Co.*,
    66 F. Supp. 2d 1355 (N.D. Ga. 1999) ...................................................................22

*Armistead v. Minor*,
    815 So.2d 1189 (Miss. 2002) .............................................................................8

*Ashland Chem. v. Barco Inc.*,
    123 F.3d 261 (5th Cir. 1997) .............................................................................8

*Behr v. Weber*,
    172 A.D.2d 441 (N.Y. App. Div. 1991) ........................................................19, 20

*Bentley v. Bunton*,
    94 S.W.3d 561 (Tex. 2002) ...............................................................................19

*Blake v. Gannett Co.*,
    529 So. 2d 595 (Miss. 1988) .............................................................................14

*Bostic v. Daily Dot, LLC*,
    2023 WL 2317789 (W.D. Tex. Mar. 1, 2023) .......................................................10

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995) .......................................................................19, 20

*Brocato v. Miss. Publishers Corp.*,
    503 So.2d 241 (Miss. 1987) .........................................................................20, 23

*Burns v. McGraw-Hill Broad. Co.*,
    659 P.2d 1351 (Colo. 1983) ..............................................................................15

*City of Houston v. Tri-Lakes Ltd.*,
    681 So. 2d 104 (Miss. 1996) .............................................................................23

*Condit v. Dunne*,
    317 F. Supp. 2d 344 (S.D.N.Y. 2004) .................................................................20

*Conroy v. Breland*,
    189 So. 814 (Miss. 1939) ...................................................................................1

*Dershowitz v. Cable News Network, Inc.*,
    541 F. Supp. 3d 1354 (S.D. Fla 2021) ...........................................................14, 20

*Doe v. Doe*,
    941 F.2d 280 (5th Cir. 1991) .............................................................................22

*Fiber Systems International, Inc. v. Roehrs*,
    470 F.3d 1150 (5th Cir. 2006) ......................................................................11, 12

*Goldfarb v. Channel One Russia*,
    — F. Supp. 3d —, 2023 WL 2586142 (S.D.N.Y. Mar. 21, 2023)..............................13, 14, 18

*In re Great Lakes Dredge & Dock Co. LLC*,
    624 F.3d 201 (5th Cir. 2010) ..........................................................................7, 8

*Greenbelt Coop. Publishing Assoc. v. Bresler*,
    398 U.S. 6 (1970) ...........................................................................................11, 12

*Hayne v. The Innocence Project*,
    2011 WL 198128 (S.D. Miss. Jan. 20, 2011) ...............................................14, 20

*Herring Networks, Inc. v. Maddow*,
    8 F.4th 1148 (9th Cir. 2021) ...........................................................................17

*Horsley v. Rivera*,
    292 F.3d 695 (11th Cir. 2002) .........................................................................12

*Jewell v. NYP Holdings, Inc.*,
    23 F. Supp. 2d 348 (S.D.N.Y. 1998)................................................................20

*King v. Miss.*,
    2015 WL 370175 (S.D. Miss. Jan 27, 2015) ...................................................23

*Lewis v. Lofton*,
    2019 WL 1867937 (N.D. Miss. Apr. 25, 2019)................................................9

*Lormand v. U.S. Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................7

*Mann v. City of Tupelo*,
    1995 Wl 1945433 (N.D. Miss. Apr. 13, 1995) ...............................................18

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) ...........................................................................13

*McDonald v. Raycom TV Broadcasting, Inc.*,
    665 F. Supp (S.D. Miss. 2009)........................................................................22

*McDougal v. Fox News Network, LLC*,
    489 F. Supp. 3d 174 (S.D.N.Y. 2020)..............................................................18

*McIntyre v. Nissan N. Am., Inc.*,
    962 F.3d 833 (5th Cir. 2020) ...........................................................................23

*McLaurin v. Melton*,
1994 WL 739671 (S.D. Miss. 1994) ........................................................23

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ............................................................. *passim*

*Montgomery v. Risen*,
875 F.3d 709 (D.C. Cir. 2017) ..............................................................13

*Mullen v. City of Grenada, Miss.*,
704 F. Supp. 2d 567 (N.D. Miss. 2010) ..............................................8, 10

*Nelle v. WHO Television, LLC*,
342 F. Supp. 3d 879 (S.D. Iowa 2018) .................................................15

*Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers, AFL-CIO v. Austin*,
418 U.S. 264 (1974) ..........................................................................11

*Pannell v. Associated Press*,
690 F. Supp. 546 (N.D. Miss. 1988) .....................................................23

*Perkins v. Littleton*,
270 So. 3d 208 (Miss. Ct. App. 2018) ..............................................10, 11

*Phantom Touring, Inc. v. Affiliated Publications*,
953 F.2d 724 (1st Cir. 1992) ..............................................................13

*Pittman v. Gannett River States Publishing Corp.*,
836 F. Supp. 377 (S.D. Miss. 1993) ......................................................22

*Pullum v. Johnson*,
647 So.2d 254 (Fla. Dist. Ct. App. 1994) ..............................................11

*Roussel v. Robbins*,
688 So. 2d 714 (1996) ........................................................ *passim*

*Texas Beef Group v. Winfrey*,
201 F.3d 680 (5th Cir. 2000) ..............................................................18

*Washington v. Smith*,
80 F.3d 555 (D.C. Cir. 1996) ..............................................................13

*Wexler v. Dorsey & Whitney, LLP*,
2019 WL 5485265 (E.D.N.Y. 2019) ......................................................18

**Statutes**

Fed. R. Civ. P. 12(b)(6) ........................................................................7, 20

Miss. Code Ann. § 95-1-5(1) ..................................................22, 23

**Other Authorities**

Restatement (Second) of Torts § 611 (1977)..............................20, 21, 22

**Exhibits**

*John Davis pleads guilty for conspiracy to defraud the State of Mississippi of millions*, WLBT DIGITAL, dated Sept. 22, 2022, available at https://www.wlbt.com/2022/09/22/john-davis-pleads-guilty-conspiracy-defraud-state-mississippi-millions/ ....................................Exhibit 1

*Favre Repays TANF Funds*, MISSISSIPPI OFFICE OF THE STATE AUDITOR, dated May 6, 2020, available at https://www2.osa.ms.gov/news/favre-repays-tanf-funds/ ........................Exhibit 2

*Brett Favre repays $600K in Mississippi welfare case; state still seeks $228K in interest*, ESPN, dated Oct. 27, 2021, available at https://www.espn.com/espn/print?id=32490476 ..........................................Exhibit 3

Southern Miss Athletics Announces Multi-Purpose Wellness Center, dated Oct. 19, 2021, available at https://southernmiss.com/news/2017/10/19/Southern_Miss_Athletics_Announces_Multi_Purpose_Wellness_Center.aspx..................................................................Exhibit 4

Plaintiff Brett Lorenzo Favre respectfully submits this memorandum of law in opposition to defendant Shannon Sharpe's Motion to Dismiss (the "Motion" or "Mot.," ECF Nos. 12-13) the Complaint ("Complaint" or "Compl.," ECF No. 1-2).

## PRELIMINARY STATEMENT

Shannon Sharpe stated on the popular cable television show he co-hosts that Brett Favre "[stole] from the lowest of the low," "[took] from the underserved," and "stole money from people that really needed that money." Compl. ¶ 18. Those statements plainly are statements of purported fact, not opinion—no matter how many times Sharpe in his motion asserts otherwise. When it counted, when he made those statements, Sharpe never said he was merely expressing his opinion. Nor did Sharpe take the opportunity to make that clear when Favre, before bringing this lawsuit, asked Sharpe to correct his statements. He does so only now because he is trying to avoid accountability for his maliciously false and defamatory statements.

But Sharpe cannot escape accountability. His statements accusing Favre of crimes were false, and Mississippi law has long empowered private citizens to defend their "good name." *Conroy v. Breland*, 189 So. 814, 816 (Miss. 1939).

Sharpe's excuse is that he relied upon media reports concerning a civil lawsuit by the Mississippi Department of Human Services ("MDHS") against dozens of defendants, including Favre, to recover state funds that MDHS itself allegedly wrongfully transferred. But that is no excuse. None of those media reports said, and no one has claimed, that Favre stole any money or committed any other crime. Criminal charges have been brought against John Davis, MDHS's former director, and Nancy New, the former head of the nonprofit Mississippi Community Education Center, Inc. ("MCEC"), which allegedly received tens of millions of dollars from MDHS. But *not* against Favre, who did not steal, and has not been charged with stealing any

money from anyone. Sharpe thus completely mischaracterized the media reports he claims he relied on, he kept key facts from his audience, and he accused Favre of committing a serious crime—all so that he could trade on Favre's name to increase his show's ratings.

Moreover, even assuming arguendo and contrary to law and fact that Sharpe's statements could be characterized as opinion, there is, under the First Amendment, no "wholesale defamation exemption for anything that might be labeled [as] 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("expressions of 'opinion' may often imply an assertion of objective fact"). In *Roussel v. Robbins*, 688 So. 2d 714 (1996), the Mississippi Supreme Court likewise confirmed that a purported statement of opinion is not protected where the statement could "reasonably be interpreted as declaring or implying an assertion of fact." *Id.* at 723 (citation omitted).

Sharpe also claims that his statements are protected because he or others on the program disclosed the purported factual basis for his purported opinion. But there is no such protection where, as here, the speaker's disclosure of the factual premise was "either incorrect or incomplete," or the speaker's "assessment of them [was] erroneous." *Milkovich*, 497 U.S at 18-19. Here, Sharpe omitted key facts—including, among many others, that while others were charged, Favre was not, and that there was no allegation that Favre knew that the funds at issue were welfare funds.

Sharpe also cannot rely on the excuse that his statements were mere hyperbole. This case is a far cry from the cases Sharpe cites, where the allegedly defamatory statements using words such as "blackmail" or "traitor" were held not actionable because in context they were not accusations of crimes. The Supreme Court in *Milkovich* made clear that for an accusation to be protected as "loose, figurative, or hyperbolic," the context must "negate the impression that the

[speaker] was seriously maintaining" that the accused person "committed the crime." *Id.* at 21. Here, there was no such context. Sharpe did not negate any such impression; he only created that impression.

*Milkovich* and *Roussel* are thus dispositive here. Sharpe's contentions that his statements are protected speech are meritless. Sharpe's statements are actionable because they are provably false statements of fact—not rhetoric, not hyperbole, and not opinion. Here, Sharpe's statements need no interpretation; on their face they declare assertions of fact—that Favre "stole" and that he stole from poor people—which means that *a fortiori* his statements "will not enjoy constitutional protection." *Roussel,* 688 So. 2d at 723.

## FACTS

### A.     Favre Retires From the NFL And Devotes Time To Business And Charitable Endeavors

Plaintiff Favre is a retired National Football League ("NFL") player who was inducted into the Pro Football Hall of Fame in 2016. Compl. ¶ 14. Since his retirement, Favre has been engaged in endorsing various products and businesses, making appearances at events, and hosting a radio show on SiriusXM, "The SiriusXM Blitz With Brett Favre and Bruce Murray." *Id.* Favre continued to be sought after by multiple companies to endorse and appear in television commercials for their products. *Id.*

Favre has also focused on charities and causes that are important to him, including his Favre 4 Hope Foundation, which he and his wife Deanna founded in 1995 and through which he has contributed millions of dollars to charities across his home state of Mississippi and elsewhere, including Make-A-Wish Foundation of America, Hope Haven, and Ribbon of Hope. Compl. ¶ 15. Favre has also supported various causes, including his alma mater, The University

of Southern Mississippi ("Southern Miss"), and the development of medication to treat and prevent concussions, an all-too-common football injury.  Compl. ¶¶ 3, 15.

**B.      MDHS Files Suit Concerning The TANF Program And Its Misuse Of Funds Through MCEC**

Favre was named in a 2022 lawsuit filed by MDHS to recover what it claims are misuse of welfare funds originating from the Temporary Assistance for Needy Families ("TANF") federal program that were unlawfully diverted by MDHS officials, in part through the non-profit MCEC.

MDHS alleges in its original complaint filed on May 9, 2022, that between 2016 and 2019, MDHS's own Executive Director, John Davis, agreed with MCEC's CEO Nancy New to unlawfully divert TANF funds.  Mot. Ex. B ¶¶ 62.  Notably, MDHS's complaint does not allege that Favre knew of this agreement.  New and Davis have pled guilty to criminal charges brought as a result of certain of these transfers.  Mot. Ex. G; Ex. 1.  No criminal charges have been brought against Favre, and there is no basis to bring any charges against him.

MDHS's original complaint sought to recover from Favre $1.1 million paid from MCEC to Favre's company in 2017 and 2018 for services that Favre was to perform, allegedly including that Favre "speak at three different public events, and one 'keynote address,' and that Favre sign autographs at events promoting MCEC itself.  Mot. Ex. B ¶ 137. But Favre had already repaid that $1.1 million to the state over *six months* before MDHS filed its complaint.  Favre was unaware that there were any improprieties with respect to the funds he received until May 2020 when Mississippi State Auditor Shad White released an audit report disclosing the findings of an investigation into the misuse of TANF funds by MDHS and MCEC.  Favre immediately offered to repay the funds he received, leading the State Auditor to comment at the time, "I want to applaud Mr. Favre for his good faith effort to make this right and make the taxpayers and TANF

families whole. To date, we have seen no records indicating Mr. Favre knew that TANF was the program that served as the source of the money he was paid." Ex. 2. Favre repaid the state $500,000 in May 2020 and the remaining $600,000 in October 2021. Ex. 3. On November 28, 2022, Favre moved to dismiss the claims against him relating to the $1.1 million on the basis that, among other things, he had already repaid those funds. MDHS responded by filing an amended complaint that abandoned all claims relating to those funds. *See* Mot. Ex. C.

The State Auditor's May 2020 report also cited as a possible misuse of TANF funds MCEC's payment to Southern Miss of $5 million in MDHS funds in late 2017, partially in connection with the construction of a volleyball facility at Southern Miss's campus. Prior to MDHS amending its complaint, and the day before Sharpe made the statements at issue here, Mississippi Today published an article titled "Former Gov. Phil Bryant helped Brett Favre secure welfare funding for USM volleyball stadium, texts reveal." *See* Mot. Ex. G. The article discusses Favre's involvement with fundraising for Southern Miss, including through communications between Favre and former Governor Phil Bryant and Nancy New. Among other falsehoods in the article, it incorrectly claims that "Favre first asked for funding" from MDHS for the volleyball facility. *Id.* at 7. In fact, it was officials at Southern Miss who requested the funding from MDHS as a continuation of a long-standing relationship between the University and MDHS. The article also claims that "[b]ecause of the strict prohibition on using TANF funds to pay for construction, the parties had to craft an agreement that would look to satisfy federal law and give the illusion they were helping needy families," and "[w]ith the help of legal advice from MDHS attorneys, they came up with the idea for New's nonprofit to enter a $5 million up-front lease of the university's athletic facilities, which the nonprofit would purportedly use for programming." *Id.* The article does not claim that Favre was one of the "parties" that crafted an agreement to satisfy

federal law or that he knew that any such agreement purportedly violated federal law—because he did not know. It also does not claim that Favre knew or believed that the agreement's provisions regarding helping needy families was an illusion—he did not know that the funds at issue were meant for needy families. The article also states that Favre's then-attorney "denied that [Favre] knew the money he received was from the welfare fund" and that "'Brett Favre has been honorable throughout this whole thing.'" *Id.* at 6.

At no point does the Mississippi Today article or MDHS lawsuit accuse Favre of stealing.

**C.      Sharpe Defames Favre And Favre Files Suit**

Defendant Shannon Sharpe, also a retired NFL Hall of Fame player, co-hosts a national weekday sports talk television show, Undisputed. Compl. ¶ 4. Clips from Undisputed are streamed on YouTube, and a podcast version of the show is available for download on various internet platforms, including Apple Podcasts, Google Podcasts, Spotify and TuneIn. Compl. ¶ 16. Since its inception in September 2016, Sharpe's Undisputed has become one of Fox Sports 1's (or FS1) most popular shows, building a loyal following of hundreds of thousands of daily viewers. Compl. ¶ 17. Video clips of Undisputed are also posted on YouTube and routinely receive tens of thousands of views. *Id.*

The day after the Mississippi Today article noted above was published, on September 14, 2022, during an episode of Undisputed which aired nationally on FS1 to over 130,000 viewers, Sharpe falsely accused Favre of serious crimes, stating:

- "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low";

- "Brett Favre is taking from the underserved [in Mississippi]"; and

- "[Favre] stole money from people that really needed that money."

Compl. ¶ 18.  Clips from this episode of Undisputed repeating Sharpe's malicious and defamatory statements were posted to YouTube and received over 1 million views, far greater than the show's clips normally receive.  Compl. ¶ 19.

Before uttering his false statements, Sharpe knew that his statements that Favre had stolen money from underserved people were false, or, at a minimum, made them with reckless disregard for the fact that they were false.    Compl. ¶ 29.

On February 3, 2023, counsel for Favre demanded that Sharpe retract and apologize for his defamatory statements.  Compl. ¶ 20.  Sharpe refused, prompting Favre to file this action. *Id*. Sharpe's false statements that Favre stole money from "the underserved" in Mississippi are malicious lies that injured Favre's reputation.  Compl. ¶ 21.

On February 9, 2023, Favre brought this defamation action against Sharpe.  Sharpe removed the action to this Court, and on May 3, 2023, Sharpe moved to dismiss the Complaint.

## ARGUMENT

"Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted," *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation and citation omitted), because a complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *In re Great Lakes Dredge & Dock Co. LLC,* 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662 (2009)).  "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)) (alteration original).

When determining whether a plaintiff has stated a valid claim for relief, the Court must "accept all well-pleaded facts as true and construe the complaint in the light most favorable to

the plaintiff." *Id*. at 210 (citing *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir. 2008)). In a diversity case, the Court applies state substantive law and federal pleading standards. *See Ashland Chem. v. Barco Inc.,* 123 F.3d 261, 265 (5th Cir. 1997).

A defamatory statement is "any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community." *Armistead v. Minor,* 815 So.2d 1189, 1193 (Miss. 2002).

Favre's allegations concerning Sharpe's statements unquestionably state a plausible defamation claim, and Sharpe does not argue otherwise. Instead, he claims that his malicious and false statements are not actionable because they were rhetorical hyperbole, opinion based on a disclosed factual premise, and a report on an official proceeding. Sharpe is wrong on all counts.

## I. SHARPE'S STATEMENTS ARE ACTIONABLE AND NOT PROTECTED BY THE FIRST AMENDMENT

### A. The Statements Are Assertions Of Fact And Not Rhetorical Hyperbole

Under Mississippi law, "[a] statement, even if phrased as an opinion, will not enjoy constitutional protection if the court concludes that its substance or gist could reasonably be interpreted as declaring or implying an assertion of fact." *Roussel*, 688 So. 2d at 723 (citation omitted). "The test applied by the court is whether [the statement] can be distilled to the essence of truth or falsity," or, in other words, whether the statement "can be shown to be true or false." *Mullen v. City of Grenada, Miss.*, 704 F. Supp. 2d 567, 575 (N.D. Miss. 2010). Here, Sharpe's statements were not phrased as an opinion and *a fortiori* do not enjoy constitutional protection. Sharpe stated that Favre has "got to be a sorry mofo to steal from the lowest of the low"; "is taking from the underserved [in Mississippi]"; and "stole money from people that really needed

that money." Compl. ¶ 18. These statements are assertions of fact that can be proven true or false—either Favre "took money" or "stole" from "poor people" or he did not.

*Milkovich*, from which Sharpe selectively quotes, is squarely on point. In considering a newspaper article that implied that petitioner committed the crime of perjury, the Supreme Court first noted that no "additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment." *Milkovich*, 497 U.S. at 21. The "dispositive question" is "whether a reasonable factfinder could conclude that the statements in the [publication] imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding." *Id.* In answering this question "in the affirmative," the court held that "the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false" because a "determination [of] whether petitioner lied . . . can be made on a core of objective evidence." *Id.* Accordingly, "'[u]nlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event.'" *Id.* at 22 (quoting *Scott v. News-Herald*, 496 N.E.2d 699, 707 (Ohio 1986)). Thus, while the court recognized the First Amendment's "vital guarantee of free and uninhibited discussion of public issues," it held:

> But there is also another side to the equation; we have regularly acknowledged the "important social values which underlie the law of defamation," and recognized that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation."

*Id.* (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)).

Adopting *Milkovich*, the Mississippi Supreme Court has held that a statement made to a newspaper that a court filing was "misleading" was actionable because it "could be reasonably understood as declaring or implying a provable assertion of fact." *Roussel*, 688 So.2d at 723; *see also Lewis v. Lofton*, 2019 WL 1867937, at *8 (N.D. Miss. Apr. 25, 2019) (Facebook posts accusing plaintiffs of "committing elder abuse" were "undoubtedly defamatory" because they

constituted "provable assertion[s] of fact"); *Mullen*, 704 F. Supp. 2d at 575 ("whether [plaintiff] is a drug addict is certainly a statement that can be shown to be true or false" and thus is "actionable as defamation").

Sharpe's statements are indistinguishable from the statements at issue in *Milkovich* and *Roussel* because they too can be proven true or false through objective evidence.

Under *Milkovich*, Sharpe's statements are also not protected "rhetorical hyperbole" as he claims. *See* Mot. at 11-15. The court there stated that implying in an article that petitioner lied under oath "is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression. *Milkovich*, 497 U.S. at 21. Here, both Sharpe's statements and the general tenor of the segment on his show did not negate the impression that Favre committed the crime of larceny—it created that impression. *See also Bostic v. Daily Dot, LLC*, 2023 WL 2317789, at *10 (W.D. Tex. Mar. 1, 2023) (statements that plaintiff "'organiz[ed] the Jan. 6 Capitol riot' and 'insurrection'" are not protected speech because they refer to "provable and specific facts and events" and are not "opinion or rhetorical hyperbole"); *Mullen*, 704 F. Supp. 2d at 574-75 (holding that statement that plaintiff "abused drugs" was not "rhetorical hyperbole" and is actionable because it "can be shown to be true or false").

One of the cases Sharpe relies upon, *Perkins v. Littleton*, 270 So. 3d 208 (Miss. Ct. App. 2018), and the cases it cites to, offer further guidance demonstrating how Sharpe's statements are distinguishable from cases involving rhetorical hyperbole. *Perkins* considered a statement made in a radio ad supporting a campaign for a circuit court judgeship that the "'father of one of [defendant's] opponents' had 'conspired' with [defendant's] family 'to go public with [a] family

dispute to derail [defendant's] campaign.'" *Perkins*, 270 So. 3d at 210. The plaintiff urged the

court to construe that statement as "an accusation that [plaintiff] was a member of a *criminal*

conspiracy." *Id.* at 216-17 (emphasis in original). In considering whether this statement was

rhetorical hyperbole, the court stated that "no reasonable listener would have understood the

radio ad's brief reference to [plaintiff] as charging him with a crime." *Id.* at 217-18. Several

other cases cited in *Perkins* also determined that statements at issue were protected as

"imaginative expression" or "rhetorical hyperbole" which could not "reasonably be interpreted

as stating actual facts about an individual." *Id.* at 217; *see Greenbelt Coop. Publishing Assoc. v.

Bresler*, 398 U.S. 6, 14 (1970) (statement that developer's negotiating tactics were "blackmail"

could not be construed as charging the developer with the commission of a crime, but rather

could only be construed as statement that the developer's "negotiating position [is] extremely

unreasonable"); *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers, AFL-CIO v.

Austin*, 418 U.S. 264, 285 (1974) (characterizing people who refuse to join union as "traitors"

cannot be understood to be charging them with committing the criminal offense of treason);

*Pullum v. Johnson*, 647 So.2d 254, 258 (Fla. Dist. Ct. App. 1994) (statement that plaintiff was a

"drug pusher" because he supported local ordinance permitting liquor sales could not be

construed as statement that plaintiff committed a crime).

The statements at issue in *Perkins* and the cases it relied upon used words—"conspiracy,"

"blackmail," "traitor," "drug pusher"—that can in some contexts relate to the commission of a

crime, but in the context of the statements at issue could not be construed in that way. The Fifth

Circuit described this distinction in *Fiber Systems International, Inc. v. Roehrs*, 470 F.3d 1150

(5th Cir. 2006), where it contrasted the use the word of "blackmail" in *Greenbelt* with statements

that the counterclaim-plaintiff stole trade secrets and other confidential and proprietary

information.  Whereas in *Greenbelt* the term "blackmail . . . clearly referred to the

unreasonableness of legal negotiating proposals discussed [at a heated city council debate] rather

than the actual crime of blackmail," the statement at issue in *Fiber Systems International, Inc.*

"refer[red] to the commission of a crime." *Fiber Sys. Int'l, Inc.*, 470 F.3d at 1164.  "The

accusation of theft, in context, did not refer to activities readily identifiable to the listener as

innocuous, as in *Greenbelt*, but instead referred to the [counterclaim-plaintiff's] alleged

misappropriation of [counterclaim-defendants'] intellectual property."  *Id.*

Similarly, words that Sharpe used—*e.g.*, "stole"—can be rhetorical in some

circumstances.  If Sharpe had accused an athlete who signed a lucrative contract with a team of

"stealing" from the team, no reasonable listener could believe that Sharpe was accusing the

player of committing a crime.  But here, when Sharpe stated that Favre is, for example,

"steal[ing] from the lowest of the low" (Compl. ¶ 18), the context was Favre's purported

connection to Mississippi's welfare scandal and there could be only one interpretation:  Sharpe

was claiming that Favre stole from poor people.

Sharpe's statements are also distinguishable from the other cases Sharpe cites.  In

*Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002), the court determined that "no reasonable

viewer would have concluded that [defendant] was literally contending that [plaintiff] could be

charged with a felony in connection with [the victim's] murder."  By contrast, Sharpe

commented (falsely) in the midst of his defamatory statements that Favre was "communicating

through text about illegal activity" (Mot Ex. J. at 17:5-8) and his co-host stated that "as yet

[Favre] has not been criminally charged nor has the ex-Governor who he conspired with *but*

*something is going to come down from this*" (*id*. at 16:20-24) (emphasis added), thus specifically

contending that Favre could be charged with a crime in connection with the welfare scandal.  *See*

*Goldfarb v. Channel One Russia*, — F. Supp. 3d —, 2023 WL 2586142, at *13 (S.D.N.Y. Mar. 21, 2023) ("[T]he accusations of criminal conduct Channel One broadcast about Goldfarb [were] statements of fact, not of opinion, because the context clearly suggests that participants on the show believed crimes were committed and did not mention criminality merely for hyperbole.") (applying New York law). In *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 908 (9th Cir. 2002), the underlying claim was for trademark infringement and the court found that accusing the putative infringing party of "theft" and using other similar terms to describe its conduct was no different than a term often used for infringers, *i.e.*, piracy, which is not taken literally. *See id.* ("No one hearing this accusation understands intellectual property owners to be saying that infringers are nautical cutthroats with eyepatches and peg legs who board galleons to plunder cargo."). The court in *Montgomery v. Risen*, 875 F.3d 709, 714 (D.C. Cir. 2017), held, without analysis, that referring to software as a "hoax" was too "loose, figurative, or hyperbolic" to be actionable. *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992), similarly held that referring to a theatrical production as a "rip-off, a fraud, a scandal, a snake-oil job," was not only "figurative and hyperbolic," but also "unprovable, since those adjectives admit of numerous interpretations." And in *Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996), the statements at issue—*e.g.*, that plaintiff is a bad college basketball coach who "usually finds a way to screw things up"—could not be verified or proven false. Unlike the statements in these cases, Sharpe's were not figurative, hyperbolic, or loose—and they are provably false. Accordingly, they are actionable.

### B. Sharpe's Statements Are Not Protected Opinions On A Disclosed Factual Premise

Sharpe all but concedes that his statements were defamatory but claims that they are privileged because they were opinions based on "disclosed and publicly reported information,"

including allegations in the MDHS litigation and other public press reports, all of which are extraneous to the pleadings. *See* Mot. at 15. To support this argument, Sharpe relies on cases that permit a speaker to state his opinion after the factual basis for the opinion is disclosed to the listener. To begin, it would be irrelevant if the factual basis was disclosed because, as noted *infra* at 18, the statements at issue here were statements of fact, not Sharpe's opinion. *See Goldfarb*, — F. Supp. 3d —, 2023 WL 2586142, at * 13 ("The disclosure of an underlying factual basis does not itself transform assertions of fact into opinions. Therefore, the claim that the underlying factual bases for the alleged libels were disclosed, even if true, is irrelevant to the question of whether those alleged libels were statements of fact or of opinion.").

Even assuming arguendo that Sharpe's statements were opinion, in order for them to be non-actionable, Sharpe's audience would have needed to have been provided with a correct and complete factual basis underlying the opinion. As the Supreme Court explained in *Milkovich*:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, **if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact**.

497 U.S. at 18-19 (emphasis added). Providing the listener with the correct and complete facts gives the listener the foundation to have "the role of accepting or rejecting the [speaker's] opinion." *Blake v. Gannett Co.*, 529 So. 2d 595, 605 (Miss. 1988).

As this Court has held previously, where a plaintiff "disputes the factual predicates of Defendants' purported opinions" or the speaker "intentionally omit[s] and distort[s] facts in an effort to maximize the harm done by the statements at issue," the statements at issue are not "non-actionable expressions of opinion based upon disclosed and undisputed facts." *Hayne v. The Innocence Project*, 2011 WL 198128, at *9 (S.D. Miss. Jan. 20, 2011) (Starrett, J.); *see also Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1367 (S.D. Fla 2021) ("[W]here

the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise.") (internal quotation marks and citation omitted) (Florida law); *Nelle v. WHO Television, LLC*, 342 F. Supp. 3d 879, 894 (S.D. Iowa 2018) ("The First Amendment does not protect opinion if the underlying facts as stated in the story . . . is determined to be false.") (Iowa law); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1360 (Colo. 1983) ("The respondent's statement that Mrs. Burns 'deserted' her husband after he was injured was not supported by disclosed facts or circumstances which would allow an average listener to evaluate the purported opinion.") (Colorado law).

Sharpe's argument is meritless because the factual basis underlying his purported opinion was incorrect and incomplete. The segment began with the show's "moderator" summarizing an article by stating that "[y]esterday an investigation by Mississippi Today found that Brett Favre, along with the help of a former Mississippi governor obtained welfare funds to help build a new volleyball center at the University of Southern Mississippi." Mot. Ex. J at 2:3-11. This summary in no way suggests that Favre stole from anyone or that he did anything nefarious. Nevertheless, seconds later and without providing his audience any further factual basis, Sharpe began making the defamatory statements at issue, stating that Favre "got to be a sorry mofo to steal from the lowest of the low[]" and that "Brett Favre is taking from the underserved." Compl. ¶ 18; Mot. Ex. J at 3:23-25, 4:6-9.

As the segment continued, Sharpe and others on the show eventually disclosed other "facts" that Sharpe relies upon (Mot. at 9-10) to claim that the facts underlying his opinion were disclosed—that Favre texted Nancy New, "If you were to pay me, is there any way the media can find out where it came from and how much?" (Mot. Ex. J at 4:13-16); that MDHS "had to file a civil lawsuit against Brett Favre because he had not paid back the interest he owed on the

15

1.1 million that he was fraudulently given for giving no speeches" (*id.* at 7:22-8:4); and that "Yahoo Sports reports that the FBI is looking into this and has actually questioned Brett Favre already about it" (*id.* at 22:12-16). But these additional facts, even when combined with the summary of the Mississippi Today article at the beginning of the segment—none of which form the basis for suggesting that Favre committed a crime—did not provide a complete or accurate disclosure of the facts.

Two of these facts—that Favre along with former-Governor Bryant obtained welfare funds to help build the Southern Miss Volleyball Facility and that MDHS sued Favre to recover interest on money he repaid to the state—are not true. Favre never "obtained welfare funds" to help build the Southern Miss Volleyball Facility. In fact, while the Mississippi Today article published a denial from Favre's then-attorney that Favre knew the funds he received were welfare funds, Mot. Ex. G at 7, Sharpe's audience was not advised of this. As to the MDHS litigation, it is also false that MDHS sued Favre to recover unpaid interest as that was not a part of its claims. *See generally* Mot. Ex. B.

These were not the only falsities presented to Sharpe's audience. During the segment, Sharpe also falsely stated that Favre "won't even pay the 1.1 [million dollars] back" (Mot. Ex. J. at 8:6-7), when Favre already had repaid the funds nearly a year before Sharpe's statements, as widely reported at the time. *See* Ex. 2 Sharpe further falsely stated, "You see what Brett Favre did for his alma mater? No. He didn't give no money came out of his pocket." Mot. Ex. J. at 5:9-14. This is also untrue—Favre and his wife have given millions of dollars to Southern Miss, including in connection with the Volleyball Facility. Sharpe's co-host claimed that Favre was paid $1.1 million "for giving no speeches" (Mot. Ex J at 8:3-4)—a reference to the allegation in

the MDHS litigation that Favre did not perform services for the money he received, which is also untrue.

As bad, numerous critical facts were omitted from the segment. In addition to omitting Favre's denial that he knew he received welfare funds, the show omitted a May 6, 2020, statement from the State Auditor, who conducted the original investigation of MDHS misspending welfare dollars, that "[t]o date, we have seen no records indicating Mr. Favre knew that TANF was the program that served as the source of the money he was paid," which was made after Favre had already repaid $500,000 of the $1.1 million he was paid and promised to repay the remaining $600,000 (*see* Ex. 3); that Southern Miss planned on using the Volleyball Facility to benefit the surrounding community by, as stated during a press conference, hosting "camps and clinics, classes, community events, seminars and group meetings" (Ex. 4); that Southern Miss officials, not Favre, first suggested obtaining funding for the Volleyball Facility through MCEC; that officials at MDHS determined how much funding to provide Southern Miss for the Volleyball Facility and proposed what became the structure for the funding; and that the Attorney General, Board of Trustees of the Mississippi Institutions of Higher Learning, Southern Miss, and numerous lawyers approved of the funding structure.[1]

The combination of these false statements of fact and omissions—which deprived the audience of the ability to judge Sharpe's comments for themselves—makes the statements at issue here, even if they were opinions, actionable. The incomplete and inaccurate factual basis for Sharpe's purported opinions also distinguishes this case from the ones cited by Sharpe. The statement in *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021)—which was decided under the higher standard of whether plaintiff had a "reasonable probability of prevailing

---

[1] Favre will support these facts with evidence as the case proceeds.

on its defamation claim" pursuant to California's anti-strategic lawsuits against public participation (anti-SLAPP) law—was an opinion based on an undisputed fact, one that the speaker, MSNBC News host Rachel Maddow, stated multiple times for her audience. The statements in *Texas Beef Group v. Winfrey*, 201 F.3d 680, 688 (5th Cir. 2000), *Mann v. City of Tupelo*, 1995 WL 1945433, at *12 (N.D. Miss. Apr. 13, 1995), *Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265, at *9 (E.D.N.Y. 2019), were similarly opinions based on disclosed and undisputed facts. In *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184 (S.D.N.Y. 2020), former Fox News host Tucker Carlson prefaced his comments by stating that he was "stipulating" to a set of facts "for the sake of argument." Where Carlson stated that he believed those stipulated facts "sound[ed] like a classic case of extortion," the court held "[t]he context in which the offending statements were made here make it abundantly clear that Mr. Carlson was not accusing [plaintiff] of actually committing a crime," but rather that he was "remarking on hypocrisy he perceives, i.e., that [then-President Donald Trump's former attorney, Michael Cohen] could be prosecuted, and the President impeached, for actions falling short of the conduct [plaintiff] purportedly engaged in during the President's campaign." *Id.* at 179, 183. Far from suggesting to the audience as Carlson did in *McDougal* that Favre was not being accused of committing a crime Sharpe's audience was informed that "[t]his is so over the line that as yet he has not been criminally charged nor has the ex-governor who he conspired with but something is going to come down from this." Mot. Ex. J at 16:19-24; *see Goldfarb*, — F. Supp. 3d —, 2023 WL 2586142, at *13 (distinguishing *McDougal*). In fact, nothing has "come down from this" for Favre as no charges have been brought against him (and there would be no basis for any charges).

That Sharpe was "in the midst of a spirited discussion on a cable sports debate show" (Mot. at 16), his own personal "soap box," does not give him license to defame. *See Bentley v. Bunton*, 94 S.W.3d 561, 585 (Tex. 2002) (finding statements on talk show to be defamatory as "[a] soap box, electronic or wooden, does not lift a speaker above the law of liability for defamation" and noting that "statements are not incapable of defamation or absolutely protected from liability merely because they are made on public access television."). Sharpe implies (Mot. at 16) that in *Behr v. Weber*, 172 A.D.2d 441 (N.Y. App. Div. 1991), the court made some exception to established defamation law because the statements at issue were made on an "unrehearsed and unscripted" talk show. Actually, the allegedly defamatory statements there were made by a *guest* on a television show, and the plaintiff sued both the guest and the television show. The court found that summary judgment was appropriate for the *television show* because the show's host informed the audience that the guest was appearing to give her own personal opinion and thus the show could not be liable for her statements which were not the show's. *Id.* at 443. The court held that the speaker herself was not liable for independent reasons that had nothing to do with whether her statements were unrehearsed and unscripted. *Id.* In *Brian v. Richardson*, 660 N.E.2d 1126, 1131 (N.Y. 1995), also cited by Sharpe, the court found that, unlike here, the defendant "set out the basis for [his] personal opinion" and that a reader would understand the statements at issue to be "as mere *allegations* to be investigated rather than as *facts*." (Emphasis in original). Insofar as the defendant published his statements in an op-ed column, New York's highest court was careful to point out that such "does not automatically insulate the author from liability for defamation" and that "we have never suggested that an editorial page or a newspaper column confers a license to make false factual

accusations and thereby unjustly destroy individuals' reputations." *Id.*[2]; *see also Condit v. Dunne*, 317 F. Supp. 2d 344, 363 (S.D.N.Y. 2004) (citing *Richardson* and finding that "a reasonable listener, aware of the media frenzy and cognizant of the apparent nature of [the talk show], nonetheless could interpret defendant's comments as assertions of fact, because the comments themselves set forth specific, detailed bases for the accusation that plaintiff was criminally involved").

At a minimum, because this is a Rule 12(b)(6) motion to dismiss and Sharpe relies upon evidence outside of the pleadings to support his argument that the factual underpinnings of his purported opinions are true, facts which Favre disputes, the motion should be denied so that Favre may have the opportunity to develop his own evidence and record as to the falsity of the underlying facts. *See Hayne*, 2011 WL 198128, at *9 (denying motion to dismiss because "Plaintiff has not had the opportunity to present his own evidence with regard to the factual predicates of Defendants' purported opinions," and "[a]ccordingly, the Court rejects Defendants' argument that the statements at issue were non-actionable statements of opinion"); *see also Dershowitz*, 541 F. Supp. 3d at 1367 (denying motion to dismiss because, inter alia, the court needed a "more fully developed record" to determine the context from television show's broadcast and information known to its audience).

### C. Sharpe's Statements Are Not Privileged Reports Of An Official Proceeding

Sharpe's argument that his statements were covered by the official proceedings privilege likewise fails. *See* Mot. at 18-19. In *Brocato v. Miss. Publishers Corp.*, 503 So.2d 241, 244 (Miss. 1987), the Mississippi Supreme Court adopted the Restatement (Second) of Torts § 611 (1977) definition of that privilege:

---

[2] Also notable is that *Behr* and *Brian* applied New York law which affords greater protections than the First Amendment. *See Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 375-76 (S.D.N.Y. 1998).

The publication of defamatory matter concerning another in a report of an official action or proceedings or of a meeting open to the public that deals with a matter of public concern is privileged **if the report is accurate and complete or a fair abridgment** of the occurrence reported.

(Emphasis added).  Comment f to § 611 provides further guidance:

Not only must the report be accurate, but it must be **fair**. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, **it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it**, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. **The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties**.

It is not always necessary that the entire proceedings be reported at one time. However, when a newspaper publishes from day to day the report of a judicial proceeding, **it may not, after reporting derogatory parts, fail to publish the further proceedings that tend to vindicate the person defamed**. The fact that the report of one side of a trial is not as complete as that of the other side is a factor to be considered in determining whether the report, as a whole, is unfair.

(Emphasis added).

There is no official report or proceeding setting forth that Favre stole from anyone.  The operative complaint in the MDHS litigation at the time Sharpe made his defamatory statements asserted claims against Favre based on his receipt of funds that *other people allegedly stole*. Those people—including John Davis and Nancy New—have been charged with crimes.  Favre has not, because he did not commit a crime.  While the complaint in the MDHS litigation alleges that Favre, through his company, received welfare funds, there is no allegation that Favre knew that those funds were welfare funds or that there was any impropriety with respect to those funds.  Mot. Ex. B ¶¶ 137-38.  Further, as noted, once Favre was notified of the alleged

impropriety, he agreed to and did return the funds he received to the state, a fact which was publicized *nearly a year* before Sharpe made his statements. *See supra* at 4-5.

Sharpe also refers to a particular motion in the MDHS litigation and its exhibits that were the subject of the Mississippi Today article relating to the Southern Miss Volleyball Facility. There too there was no reference to Favre stealing anything. And in no event—including because, as noted *supra* at 18, Sharpe and his co-host made false statements and material omissions—could Sharpe's comments be construed as an accurate and complete or fair abridgement of the proceeding. *See Doe v. Doe*, 941 F.2d 280, 291-292 (5th Cir. 1991) (applying Restatement (Second) of Torts § 611 to Louisiana law to hold numerous statements that differed from official report were actionable); *AirTran Airlines, Inc. v. Plain Dealer Pub. Co.*, 66 F. Supp. 2d 1355, 1367 (N.D. Ga. 1999) (same, applying Georgia law).

*Pittman v. Gannett River States Publishing Corp.*, 836 F. Supp. 377 (S.D. Miss. 1993) and *McDonald v. Raycom TV Broadcasting, Inc.*, 665 F. Supp, 3d 688 (S.D. Miss. 2009), cited by Sharpe, are distinguishable because, unlike here, the defendants in those cases accurately reported on comments made in an official proceeding (*Pittman*) or that was furnished directly by law enforcement officials (*McDonald*).

## II.     NOTICE OF SUIT WAS NOT REQUIRED

Sharpe claims that the complaint should be dismissed because, he presumes, that Miss. Code Ann. § 95-1-5(1) applies to him and that Favre did not wait the requisite 10 days after sending a retraction letter to commence this lawsuit. This argument is meritless because § 95-1-5(1) is inapplicable. Section 95-1-5(1) states, "[b]efore any civil action is brought for publication . . . against any radio or television station *domiciled in this state*, the plaintiff shall, at least ten (10) days before instituting any such action, serve notice . . . on the defendant." (Emphasis added).

Neither Sharpe, his show, nor the cable channel his show appears on is a "radio or television station domiciled in this state," and he does not claim otherwise. Thus, by the plain language of the statute, Section 95-1-5(1) is inapplicable to Sharpe. *See McIntyre v. Nissan N. Am., Inc.*, 962 F.3d 833, 837 (5th Cir. 2020) ("[W]hen 'the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction.'") (quoting *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 2027 (Miss. 2011); *City of Houston v. Tri-Lakes Ltd.*, 681 So. 2d 104, 106 (Miss. 1996) ("[T]his Court cannot omit or add to the plain meaning of the statute or presume that the legislature failed to state something other than what was plainly stated.").

Unlike Sharpe, the defendants in the cases he cites—*Brocato v. Miss. Publishers Corp.*, 503 So.2d 241 (Miss. 1987), *King v. Miss.*, 2015 WL 370175 (S.D. Miss. Jan 27, 2015), and *McLaurin v. Melton*, 1994 WL 739671 (S.D. Miss. 1994)—were newspapers or broadcasters based in Mississippi and covered by the statute. *Pannell v. Associated Press*, 690 F. Supp. 546 (N.D. Miss. 1988), is inapposite because it did not address whether the Associated Press was domiciled or authorized to do business in Mississippi, as required for the statute to apply.[3]

---

[3] As a practical matter, dismissal pursuant to Section 95-1-5(1) would only cause delay because Favre could simply reassert his claim in a new lawsuit brought within the limitations period. *See Brocato*, 503 So.2d at 243 ("The Court finds the ten day notice required in § 95–1–5 is clearly a necessary preliminary step to the proper filing of a libel action and that the preliminary step must be satisfied within the statutory limitation period.").

## CONCLUSION

For the foregoing reasons, the Motion should be denied.


Dated: May 24, 2023                          Respectfully submitted,


By:    */s/ Eric D. Herschmann*
**ERIC D. HERSCHMANN, Esq.** (*pro hac vice*)
210 Lavaca Street
Austin, Texas 78701
Telephone: (512) 551-3344
Facsimile: (512) 798-4376
Email:  EDHNotice@gmail.com

**KASOWITZ BENSON TORRES LLP**
Daniel R. Benson, Esq. (*pro hac vice*)
Email:  DBenson@kasowitz.com
Jennifer M. McDougall, Esq. (*pro hac vice*)
Email:  JMcDougall@kasowitz.com
Daniel J. Koevary, Esq. (*pro hac vice*)
Email:  DKoevary@kasowitz.com
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

**MICHAEL J. SHEMPER, PLLC**
Michael J. Shemper (MSB# 100531)
Attorney at Law
140 Mayfair Road, Suite 1200
Hattiesburg, MS   39402
Telephone: (601) 545-7787
Facsimile: (601) 545-1711
Email:  michael@shemperlaw.com

**SULLIVAN & SULLIVAN, PLLC**
James Robert "Bob" Sullivan, Jr. (MSB# 8613)
Attorneys at Law
424 Sawmill Road
P. O. Box 45
Laurel, MS 39441
Telephone: (601) 428-1505
Facsimile: (601-428-1590)
Email: bob@sst-lawoffice.com

*Counsel for Plaintiff Brett Lorenzo Favre*

## CERTIFICATE OF SERVICE

I, Eric D. Herschmann do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 24th day of May, 2023

_/s/ Eric D. Herschmann_