IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**BRETT LORENZO FAVRE**                                                          **PLAINTIFF**

VS.                                               CIVIL ACTION NO.: 2:23-CV-00042-KS-MTP

**SHANNON SHARPE**                                                               **DEFENDANT**

### DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
### MOTION TO DISMISS

### INTRODUCTION

Brett Favre has brought this action over unflattering comments Shannon Sharpe made on his cable show about Favre's widely reported—and undisputed—involvement in the Mississippi welfare scandal. Like the Complaint, Favre's opposition does not deny he received welfare funds to help pay for a volleyball facility at his alma mater. Nor does Favre deny that he repaid $1.1 million in public funds, and that the State is suing him to recover millions more. Favre's only real quarrel is with Sharpe's word choice in commenting on these widely reported facts—specifically, Sharpe's description of Favre's undisputed conduct as "stealing" and "taking" from poor families.

Favre argues that Sharpe's comments left viewers with the impression that he was charged with the "crime of larceny." But contrary to Favre's assertions, the Broadcast expressly informed viewers that Favre had *not* been criminally charged and was facing only the State's *civil* lawsuit. Sharpe also referred to Favre's defense that "he didn't know" the money he received was meant for the needy.

Favre admits that context matters in defamation cases involving rhetorical hyperbole. A reasonable viewer could not have understood Sharpe, also a former pro football player, to literally charge Favre with a crime. Instead, any reasonable viewer would understand Sharpe's statements—made in the context of a sports debate show known for its fiery takes on the biggest

headlines in the sports world—as rhetorical hyperbole expressing Sharpe's harsh criticism of Favre's actions. This kind of loose, figurative language on a highly publicized scandal involving government money and a public figure is at the core of what the First Amendment protects.

Moreover, Sharpe's subjective commentary on Favre's role in the scandal was based on a well-known and disclosed fact: that Favre received public funds intended for the disadvantaged. Sharpe's comments were made against the backdrop of two years of media coverage of Favre's role in the welfare scandal and the State's lawsuit against Favre. From the start of the Broadcast, viewers were informed that Sharpe would be commenting on a news article published the day before—which included Favre's own text message to a now-convicted felon asking, "If you were to pay me is there anyway the media can find out where [the money] came from and how much?" Based on all the information provided to viewers, Sharpe's rhetorical invocation of the terms "stealing" and "taking" could not be understood to imply ***undisclosed*** false and defamatory facts.

Sharpe's caustic commentary is not actionable under established federal and state law. The Complaint should be dismissed with prejudice.

## ARGUMENT

### I.  This action is ripe for dismissal on a motion to dismiss.

As this Court has observed, "the trial court in a defamation case must make the threshold determination of whether the language in question is actionable." *Hayne v. The Innocence Project*, 2011 WL 196128, at *2 (S.D. Miss. Jan. 20, 2011) (Starrett, J.), quoting *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988), *aff'd*, 865 F.2d 664 (5th Cir. 1989) ("a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit"). Courts considering a motion to dismiss a defamation claim "routinely" address "issues such as whether the statement at bar is capable of a defamatory meaning, … [or] whether it is protected opinion." *Mitchell*, 703 F. Supp. at 1258 n. 10. Dismissal of defamation suits for failure to state a claim

occurs "with relative frequency." *Id*. This Court can therefore make the determination of whether statements are non-defamatory rhetorical hyperbole or opinion through review of the Broadcast.[1]

Favre does not dispute that on a motion to dismiss, this Court can consider the Complaint, the Broadcast, and the other materials submitted with Sharpe's motion to dismiss. Favre merely argues, in effect, that there is more to the story than what has been widely reported. What is relevant here, however, is not how Favre might defend himself in a criminal proceeding or what evidence he might present at trial in the State's civil case against him. Instead, the only relevant facts are what Sharpe and his audience knew at the time of the Broadcast and how reasonable viewers would have understood Sharpe's comments given that context. To resolve that question, the Court need only look to the Broadcast itself and determine whether, viewed in context, Sharpe's statements amounted to mere rhetorical hyperbole and expressions of opinion about Favre's reported conduct. Those questions can, and should, be answered by this Court on a motion to dismiss. Their resolution does not depend on facts known only to Favre or to be developed in discovery.

## II.  Sharpe's rhetorical hyperbole and figurative expressions about Favre are protected speech that cannot support a defamation claim as a matter of law.

Favre argues that in commenting on Plaintiffs' role in the welfare scandal, Sharpe accused Favre of the "crime of larceny." Favre does not dispute that he accepted public funds that were intended to go to needy families, that he returned over $1 million to the State, and that the State has sued him to recover millions more.[2] He simply objects to the way Sharpe characterized that conduct. In particular, Favre challenges Sharpe's commentary that accepting money from the

---

[1] *See Farah v. Esquire*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("summary proceedings are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted") (internal quotations and citation omitted).

[2] At the time of the Broadcast, the State's suit alleged that Favre was liable to MDHS for $1.1 million in misspent funds. Exh. "B" at ¶ 167(C) (Complaint in *MDHS v. MCEC*). The State's amended lawsuit alleges Favre's failure to repay the interest on that amount. Exh. "C" at ¶¶ 105-106 (First Amended Complaint).

3

government that was meant for the needy—which Favre did—amounted to, in Sharpe's words, "stealing from the lowest of the low," "from people that really needed that money," and "taking from the underserved." Viewing the Broadcast in its full context, a reasonable viewer could not have understood Sharpe to be accusing Favre of literally committing the "crime of larceny." Instead, as the Broadcast as a whole made clear, Sharpe was merely using hyperbolic, rhetorical flourish to describe what he viewed as disreputable conduct by Favre. That is all the more apparent given that Sharpe's viewers were told that Favre was not facing criminal liability.

Statements like Sharpe's are classic examples of figurative, rhetorical language the First Amendment protects.[3] The mere fact that the word "stole" could, in some contexts, literally accuse someone of a crime does not take it outside of constitutional protection.[4] Highly charged language must be viewed in its "broad context" to determine whether it would reasonably be construed in a literal sense. *See Partington v. Bugliosi,* 56 F.3d 1147, 1153 (9th Cir.1995) ("one must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact") (citing *Milkovich*, 497 U.S. at 19). The context in which Sharpe's remarks were made—including the tenor of the Broadcast as a whole, the format of the program and its audience, and the fact that viewers were told Favre was not charged with a crime—forecloses Favre's claim that a reasonable viewer would have thought Sharpe was actually accusing him of committing "larceny."[5]

---

[3] Favre claims that Sharpe "cannot rely on the excuse that his statements were mere hyperbole." Opp. at 2. But rhetorical hyperbole, which "has traditionally added much to the discourse of our Nation," is not an "excuse." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). It is protected speech.

[4] *See Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714 (11th Cir. 1985) (circumstances surrounding publication must be considered, including medium of dissemination and audience).

[5] *See Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970) ("even the most careless reader must have perceived that the word was no more than rhetorical hyperbole" and thus "imposition of liability on such a basis was constitutionally impermissible"); *Phantom Touring, Inc. v. Affiliated Publications, 953.2d 724* (1st Cir. 1992) ("fraud" was "figurative and hyperbolic"; "format generally known to contain more opinionated writing than the typical news report").

For one thing, courts have repeatedly recognized that sports talk shows serve as a "traditional haven for cajoling, invective, and hyperbole."[6] Just so here. Sharpe was not speaking as a legal commentator outlining the bases for a criminal indictment of Favre. Sharpe's viewers know that Sharpe is a retired football player and television personality—not a lawyer, prosecutor, judge, or law enforcement official. Nothing in the Broadcast suggested that Sharpe had analyzed the legal intricacies of larceny to objectively "to present his opinions as legal truth framed in legal verbiage" and make a criminal accusation against Favre. *Franklin v. Dynamic Details, Inc*., 10 Cal.Rptr.3d 429, 439–40 (Cal. App. 4 Dist. 2004). "The average [viewer] therefore would not have assumed the statements had the weight of a legal opinion." *Id.*

Instead, Sharpe's reasonable viewers understood that he was expressing his moral outrage over the undisputed fact that a multi-millionaire former NFL quarterback accepted funds that were supposed to serve the poorest citizens of the nation's poorest state to build a volleyball arena at his alma mater. It was obvious to any reasonable viewer that Sharpe spoke figuratively—that receiving money intended for the needy was, metaphorically speaking, "stealing" from them. Sharpe was not asserting that Favre literally picked the pockets or robbed the homes of Mississippi's needy, nor would a reasonable viewer believe that was what Sharpe was saying.[7]

Favre acknowledges that if Sharpe accused a hypothetical athlete who signed a lucrative contract of "stealing" from the team, "no reasonable listener could believe that Sharpe was

---

[6] *Stepien v. Franklin,* 39 Ohio App.3d 47, 528 N.E.2d 1324, 1329 (1988) (citations and internal quotations omitted). *See Gardner v. Martino,* 563 F.3d 981 (9th Cir.2009) (talk show with drama, hyperbolic language, opinionated arrogant hosts, and heated controversy reduce audience's expectation of learning an objective fact); *Brooks v. Paige,* 773 P.2d 1098, 1101 (Colo. Ct. App.1988) (comments made in context of "live television broadcast of a local sports talk show" with a sports-minded audience" were "not deliberate or reckless falsehoods, but merely rhetorical hyperbole"), *cert. denied* (Colo. 1989).

[7] *See, e.g., Polish American Immigration Relief Comm., Inc. v. Relax*, 596 N.Y.S.2d 756, 757, 758 (1st Dept. 1993) (calling plaintiffs "thieves who should have been put to prison" held to be "rhetorical hyperbole" and not actionable under constitutional standards); *Ram v Moritt*, 612 N.Y.S.2d 671, 1994 WL 244514 (2d Dept. June 06, 1994) (upholding motion to dismiss because calling plaintiff a "cheat" was constitutionally protected rhetorical hyperbole rather than objective fact).

5

accusing the player of committing a crime." Opp. at 12. Favre's admission that accusing someone of stealing can be rhetorical hyperbole "in some circumstances" reinforces the conclusion that context matters. In effect, Favre *did* sign a "lucrative contract" with the State of Mississippi—with terms that one could loosely characterize as "stealing" from his fellow Mississippians.

In determining whether a statement constitutes rhetorical hyperbole, courts also look to how controversial the issue discussed was and how timely the comments were.[8] Sharpe's comments came amid breaking developments about Favre's involvement in the unfolding welfare scandal, including the public disclosure of text messages between Favre and a now-convicted non-profit head asking: "If you were to pay me is there anyway the media can find out where it came from and how much?" Favre argues that Sharpe falsely commented that "Favre was communicating through text about illegal activity," but it is beyond dispute that Favre was texting with a soon-to-be felon about receiving misspent state funds from her. Opp. at 12.

The Broadcast does not support Favre's claim that Sharpe's comments and the tenor of the Broadcast created the impression that Favre committed the crime of larceny. The context of Sharpe's statements made it clear that he was simply reacting to new disclosures, as the Broadcast summarized the information about Favre that had been made public, including that Favre denied knowledge of using welfare funds and had not been charged with a crime. The tenor of the show was that Sharpe had strong feelings about Favre's reported actions, which he expressed, not that he was offering additional factual content on the legal consequences of those actions.

Favre argues that "the context must 'negate the impression that the [speaker] was seriously maintaining' that the accused person 'committed the crime.'" Opp. at 2-3, 10. Having alleged that

---

[8] *See Horsley v. Feldt,* 304 F.3d 1125, 1132 (11th Cir. 2002) (heated nature of discussion and its temporal proximity to event are factors probative of rhetorical hyperbole); *Rosenaur v. Scherer*, 105 Cal. Rptr. 2d 674, 687–88 (Cal. App. 3 Dist. 2001) (calling political foe a "thief" during hard-fought political contest was rhetorical hyperbole, recalling the words of Justice Hugo Black that "it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions").

Sharpe defamed him by not negating the "impression" that Favre committed the crime of larceny, Favre is bound by that construction of Sharpe's statements. *See Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002). Favre's construction of Sharpe's statements establishes that Favre's Complaint should be dismissed. There is no requirement in the law that Sharpe affirmatively "negate" an alleged "impression" that Favre committed the crime of larceny.

*Milkovich* further undermines Favre's claims. In *Milkovich*, the defendant said that the plaintiff "lied at the hearing after . . . having given his solemn oath to tell the truth." *Milkovich v. Lorain J. Co.*, 497 U.S. 5, n.2 (1990). This statement was not "rhetorical hyperbole" or "loose, figurative language." It was a statement of fact meant to be taken at face value. Moreover, the defendant conveyed the impression that he had special knowledge as to whether this accusation was true. He attended both the hearing when the plaintiff allegedly "lied" and the wrestling meet that was the subject of the hearing, and claimed that this put him "in the unique position of being the only non-involved party to observe both the meet itself and [the plaintiff's] version presented [at the hearing]." In other words, the defendant in *Milkovich* said he was not only an eyewitness to whether the plaintiff had "lied," but the *only* objective eyewitness.

Sharpe never claimed to have investigated the facts surrounding Favre's role in the welfare scandal in Mississippi or to have witnessed any relevant meeting. A reasonable viewer in Sharpe's audience would not think that Sharpe had any special knowledge about the allegations or their potential legal consequences and would understand that Sharpe's comments were based on published reports, in part because the Broadcast expressly referred to those published reports.[9]

---

[9] The other cases cited by Favre do not help his case. *Mullen v. City of Grenada*, 704 F.Supp.2d 567 (N.D. Miss. 2010), involved a city grievance process where a police officer was accused of being a drug addict, the antithesis of a sports show. In *Fiber Systems Intl. Inc. v. Roehrs*, 470 F.3d 1150 (5th Cir. 2006), plaintiffs were accused of stealing computers and trade secrets in a letter by a company lawyer and *in a police report*—formal communications unlike a sports show. In *Roussel v. Robbins*, 688 So. 2d 714 (1996), there was no rhetorical hyperbole or figurative language, but factual declarations that the plaintiff "changed the meaning of sentences included in [an abstract], by eliminating certain words."

Favre asserts that Sharpe's co-host's comment that "[Favre] has not been criminally charged" but "something is going to come down" was "contending that Favre could be charged with a crime." Opp. at 12. In fact, those remarks directly undermine Favre's assertion that viewers were left with the impression that he *already* had been charged with a crime.[10] The Broadcast ***explicitly*** informed viewers that Favre had ***not*** been charged with a crime and speculated that "something" would come down, but it was unknown ***what***. These statements reinforce the conclusion that Sharpe's comments were not assertions of fact that Favre had committed larceny but instead reflected his impassioned opinions about the misuse of welfare funds.[11]

The First Amendment allows commentators like Sharpe to use "uninhibited, robust, and wide-open" language to debate the ethics of a highly public figure's reported actions.[12] Expressing moral indignation with exaggerated rhetoric, as others have done in describing a negotiating tactic as "blackmail" or a worker as a "traitor," is exactly the kind of figurative language that the First Amendment protects.[13] Because Sharpe's comments are constitutionally protected rhetorical hyperbole and loose, figurative language, they are nonactionable as a matter of law.

### III.  The Complaint fails to state a defamation claim, as a matter of law, because the challenged statements were opinions with a disclosed factual basis.

Favre's claim also fails because the challenged statements reflect Sharpe's subjective opinions about Favre's conduct, which were grounded in disclosed facts—namely, the widespread

---

[10] Others also have speculated that Favre could be criminally charged. *See* Rosenberg, *The Driving Force: How Brett Favre's Demands for Cash Fueled a Scandal*, SPORTS ILLUSTRATED, May 18, 2023, https://www.si.com/nfl/2023/05/18/brett-favre-mississippi-welfare-scandal-driving-force-daily-cover. This article reported Favre texted, "I [can't] focus on anything else with this looming." Three years later, something else looms over Favre: the distinct possibility he will be indicted."

[11] *See Rivera*, 292 F.3d at 702 (loose, figurative language expressed belief in moral culpability, not crime of murder); *McDougal v. Fox News Network*, 489 F.Supp.3d 174 (SDNY 2020) (saying stipulated facts "sounded like a classic case of extortion" was protected hyperbole).

[12] *See New York Times v. Sullivan*, 376 U.S. 254 (1964).

[13] *See Greenbelt,* 398 U.S. at 14; *Letter Carriers v. Austin,* 418 U. S. 264, 284-286 (1974).

reporting on Favre's receipt of money properly destined for poor Mississippians. Favre argues that Sharpe's statements were statements of fact, rather than opinions. But Favre fails to engage with the full context in which Sharpe's statements about Favre "stealing" and "taking" appeared.[14] The challenged statements were made during a heated segment on a sports debate show, filled with statements that could only be understood as Sharpe's subjective opinions about Favre—including Sharpe calling Favre a "sorry mofo." Against that backdrop, a reasonable viewer would not have understood Sharpe's references to "stealing" as assertions of fact. In context, Sharpe's comments were plainly expressions of his opinion—couched in the outspoken and even vituperative verbiage that is the staple of sports debate shows—that Favre's widely reported conduct amounted to "stealing" or "taking from the underserved." At no point did Sharpe claim to possess facts unknown to viewers, nor would reasonable viewers have thought he did.

As to the factual basis underlying Sharpe's opinions, Favre cannot dispute that the Broadcast opened with a summary of the news article published the day before and proceeded to comment on the facts reported in that article. Nor does Favre deny that there had been widespread media coverage on his involvement in the welfare fraud scandal—and the State's lawsuit to recover misspent welfare funds from Favre—for more than two years before the Broadcast.

Instead, Favre quibbles with the order in which the underlying facts were presented and the precise words used to summarize those facts. But Favre identifies no inaccuracies in the Broadcast that would transform Sharpe's protected statements of opinion into actionable defamation. Favre argues that the news on which Sharpe was commenting did not report that Favre had committed the crime of theft. But Sharpe never suggested otherwise. To the contrary, the Broadcast expressly acknowledged that Favre had not been criminally charged and was currently

---

[14] *See Gales v. CBS Broad., Inc.*, 2004 WL 1961680, at *5 (S.D. Miss. July 9, 2004) ("defamatory communications of television media" are considered in "context of the entire broadcasted news report").

only facing civil liability.[15] Sharpe also acknowledged Favre's assertion that "he didn't know" the funds he received were supposed to go to needy families.[16] Having established this fact, Sharpe responded by reading Favre's text in which he asked a non-profit head who received millions in welfare funds, "If you were to pay me, is there any way the media can find out where it came from and how much?" Sharpe then offered his subjective opinion that the words of Favre's own text showed that Favre *knew* he was doing *wrong*. In context, a reasonable viewer would understand that this was Sharpe's opinion about the ethics of Favre's disclosed actions and the plausibility of Favre's story, not a legal analysis about the commission of a particular crime.[17] Sharpe's "caustic commentary is simply not actionable" as it did not "imply the allegation of undisclosed false and defamatory facts." *See Ferguson v. Watkins*, 448 So. 2d 271, 275-76 (Miss. 1984).

Favre also argues that the Broadcast's introduction of the latest news on the welfare scandal was an insufficient preface to Sharpe's comments. The Broadcast's introduction was:

> Yesterday, an investigation by *Mississippi Today* found that Brett Favre, along with the help of a former Mississippi Governor, obtained welfare funds to help build a new volleyball Center at the University of Southern Mississippi.[18]

The moderator's introduction succinctly summed up the breaking news on which Sharpe's comments were based. Favre's argument that Sharpe's opinions came too early in the Broadcast is contrary to state and federal case law, which requires that the entire Broadcast be considered to determine whether Sharpe's comments, *in context*, are defamatory. *See Gales*, 2004 WL 1961680, at *5; *Lawrence*, 573 So. 2d at 698. The full context of the Broadcast shows that Sharpe was commenting on the latest publicly disclosed news about Favre's role in the welfare scandal.

---

[15] *See* Exh. "I" (video) at 07:35-07:37; Exh. "J" at 16 (transcript).

[16] *See* Exh. "I" (video) at 01:12-01:14; Exh. "J" at 4 (transcript).

[17] *See e.g. Coastal Abstract Serv., Inc. v. Firm Am. Title Ins. Co.*, 173 F.3d 725, 731-32 (9th Cir. 1999) ("statements by laypersons that purport to interpret the meaning of a statute ... are opinion statements, and not statements of fact).

[18] *See* Exh. "I" (video) at 00:03-00:15; Exh. "J" at 2 (transcript).

PD.42212101.1

Under Favre's skewed notion of defamation law, citizens could not comment on a public figure such as Favre's role in a public scandal without presenting an exhaustive review of every detail of a multi-year investigation—an unworkable premise in the world of public commentary, and one the law does not require. Instead, the speaker must only state the facts on which the opinion is premised, which may, as here, include a synopsis of a developing matter of public concern. No law supports Favre's extraordinary assertion that a documentary's worth of background must be provided before protected on-air opinions are expressed. *See generally Ferguson*, 448 So. 2d 271.

Here, the Broadcast provided viewers with the information needed for them to perform "the role of accepting or rejecting [Sharpe's] opinion" about Favre's widely reported role in the welfare fraud scandal. *Blake v. Gannett Co.*, 529 So. 2d 595, 605 (Miss. 1988)."[19] The First Amendment and Mississippi law require nothing more.

Favre cites *Hayne v. The Innocence Project*, 2011 WL 198128 (S.D. Miss. Jan. 20, 2011), for the proposition that if Favre disputes the reported facts on which the commentary is based, the opinions stated are actionable. But in *Hayne*, the *defendants* developed all the "facts" on which they based their alleged opinions. Here, by contrast, Sharpe did not develop *any* facts about Favre's role in the welfare scandal—he merely commented on facts uncovered by the State and widely reported in the news media right up to the day before the Broadcast.

Sharpe's comments are entitled to further protection because he relied on disclosed facts drawn from official proceedings. Favre disputes the accuracy of the Broadcast's synopsis, arguing that the State "asserted claims against Favre based on his receipt of funds that *other people allegedly stole*" Opp. at 21 (emphasis in original). Favre appears to be making the point that he only *received* allegedly stolen money, but never denies that some of the "allegedly stole[n]" money

---

[19] Favre cites *Blake* for the untenable proposition that speakers must supply "complete facts" before giving their opinion. Opp. at 12. *Blake* says nothing of the sort and does not require any particular quantification of factual disclosure.

went to him. That exceedingly fine line has no bearing on whether the official proceedings privilege applies.

The point here is that Sharpe's comments were "***drawing upon*** official documents or proceedings." *See Pittman v. Gannett River States Pub. Corp.,* 836 F. Supp. 377, 384-85 (S.D. Miss. 1993) (emphasis added). Sharpe's comments about Favre were grounded in official statements in legal pleadings and documents introduced in official proceedings about a public figure.[20] As those "official documents or proceedings" reflect—and as Favre admits—officials accuse Favre of receiving welfare funds that were intended for poor people. The critical point is that unlike in *Hayne*, for example, Sharpe's opinions were based on revelations from these official sources, and not from Sharpe's own investigation—as his viewers well knew.

Favre reprises his oft-repeated refrain that "there is no allegation that Favre knew those funds were welfare funds." But Sharpe's comments did not depend on Favre knowing that he was receiving welfare funds. Whether or not Favre knew, he was still, in Sharpe's opinion, "taking from the underserved" and "stealing from the lowest of the low." A defense based on Favre's logic may work in a criminal courtroom, but all Sharpe must show in this defamation action is that his opinions had a factual basis. The Broadcast demonstrates that they did.

Favre asserts that Sharpe's comments are not protected by Mississippi law because the brief Broadcast segment did not detail every Favre denial or every fact that could be perceived as favorable to Favre.[21] But *Pittman* makes clear that "[i]t is not necessary that [a media report] be

---

[20] Favre seeks to portray himself as a "private citizen." Opp. at 1. That characterization is misleading. Favre is a public figure as a matter of constitutional law, as the Complaint's detailed recitation of his exploits as an NFL quarterback, broadcaster, and commercial pitchman make clear. Complaint at ¶ 14; *see also Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1247 (5th Cir. 1980) (former retired NFL player was public figure); *Pippen v. NBC Universal Media, LLC*, 11-cv-8834, 2012 WL 12903167 (N.D. Ill. Aug. 2, 2012) (NBA star was public figure).

[21] Favre chides Sharpe for not saying that USM "planned on using the Volleyball Facility to benefit the surrounding community," that USM officials "first suggested obtaining funding for the Volleyball

exact in every immaterial detail," and that "a denial is only a small factor in determining whether the entire article is fair." 836 F. Supp. at 383, 385 n. 13.

Favre's position—that unless he is formally charged with a crime, no one can debate the meaning of what he did in the Mississippi welfare scandal—is anathema to the First Amendment and to Mississippi law. The law protects Sharpe's right to comment on proceedings and investigations into misspent welfare funds while they are ongoing, even though not all the evidence has come out and the ultimate disposition is unknown. As *Ferguson* teaches, "nothing in life or our law guarantees a person immunity from occasional sharp criticism, nor should it. Short of becoming a hermit, no person avoids a few linguistic slings and arrows, many demonstrably unfair.… [S]uch persons are not libeled even though described in caustic if not contemptuous language and even though to a neutral observer the criticism is unfair, so long as clear falsity of fact is not found in the editorial commentary." *Id.* at 273, 276.[22]  Such is the case here.

Sharpe's critical comments about Favre, based on disclosed facts from official proceedings, are "simply not actionable libel," *id.* at 276. The Complaint should be dismissed.

### IV. Plaintiff failed to comply with the Mississippi retraction statute.

The scope of Mississippi's retraction statute is broad. Consistent with the "clear intent" of the statute, the notice requirement applies not only to local news outlets, but also to "*cable and satellite transmissions*," which encompasses the Broadcast.[23] Plaintiff offers no case law supporting his claim that Section 95-1-5 does not apply here.

---

Facility through [the discredited non-profit], or that welfare officials "determined how much funding to provide USM." Opp. at 17. None of these immaterial details change the key fact that Favre undisputedly received public funds meant for poor people.

[22] *See also Madison v. Frazier*, 539 F.3d 646, 657 (7th Cir. 2008) ("[M]embers of a free society must be able to express candid opinions and make personal judgments. And those opinions and judgments may be harsh or critical—even abusive—yet still not subject the speaker or writer to civil liability.")

[23] *Pannell v. Associated Press*, 690 F. Supp. 546, 549 n.2 (N.D. Miss. 1988) (emphasis added). Favre argues that that *Pannell* does not say whether the Associated Press was domiciled or authorized to

Moreover, the Complaint itself alleges that Sharpe "committed a tort in … in Mississippi" and that "a substantial event that caused the injury occurred in [Lamar] county."[24] Favre cannot have it both ways—arguing both that Sharpe is subject to jurisdiction and venue in Mississippi while contending that the Mississippi retraction statute does not apply to him.

Favre's pre-suit letter makes clear he recognized the need to comply with the retraction notice requirement. Favre simply jumped the gun by suing before the statutory timeline expired.[25] Favre cannot now complain that Sharpe "refused" to air a retraction when he was not given the full time to respond. Favre's failure to comply with Section 95-1-5 requires dismissal.[26]

## CONCLUSION

Sharpe's Motion to Dismiss should be granted and the Complaint dismissed with prejudice.

BY: /s D. Michael Hurst, Jr.

| | |
|---|---|
| Mary Ellen Roy, T.A. (LA Bar #14388) (pro hac vice) PHELPS DUNBAR, LLP 365 Canal Street, Suite 2000 New Orleans, Louisiana 70130-6534 Telephone: (504) 566-1311 maryellen.roy@phelps.com | D. Michael Hurst, Jr. (MSB 99990) James W. Shelson (MBN 9693) Mark Fijman (MBN 99153) PHELPS DUNBAR, LLP 4270 I-55 North Jackson, Mississippi 3911-6391 Telephone: (601) 352-2300 jim.shelson@phelps.com mark.fijman@phelps.com |
| Joseph M. Terry (D.C. Bar #473095) (pro hac vice) WILLIAMS & CONNOLLY LLP 680 Maine Avenue SW Washington, D.C. 20024 Telephone: (202) 434-5000 Email: jterry@wc.com | **ATTORNEYS FOR DEFENDANT SHANNON SHARPE** |

---

do business in Mississippi. Opp. at 23. However, it is common knowledge that the Associated Press is not based in Mississippi but transmits news into the state. Indeed, *Pannell* itself states that the Tupelo newspaper published articles based on a wire report from the Associated Press. 690 F. Supp. at 547.

[24] Complaint ¶¶ 11, 12.

[25] *See* Exh."K" (February 3, 2023 Letter from Kasowitz Benson Torres, LLP).

[26] *See Brocato v. Mississippi Publishers Corp.*, 503 So.2d 241, 243 (Miss. 1987) (dismissal proper where plaintiff filed suit prior to 10-day requirement.

## CERTIFICATE OF SERVICE

I, D. Michael Hurst, Jr., do hereby certify that on June 6, 2023 I electronically filed this ***REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS*** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record. This the 6th day of June, 2023.

/s D. Michael Hurst, Jr.
D. Michael Hurst, Jr.

PD.42212101.1