#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
#### EASTERN DIVISION

**BRETT LORENZO FAVRE**                                                                    **PLAINTIFF**

**v.**                                                              **CIVIL ACTION NO. 2:23-cv-42-KS-MTP**

**SHANNON SHARPE**                                                                           **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This cause comes before the Court on the Motion to Dismiss [12] filed by Defendant, Shannon Sharpe. Plaintiff has responded [18], and Defendant filed a reply [22]. Having reviewed the parties' submissions, the Complaint, and the relevant legal authorities, and otherwise being duly advised in the premises, the Court finds that the motion is well taken and will be granted for the reasons set forth herein.

**I. BACKGROUND**

This dispute in this case arises from statements made by Shannon Sharpe, an NFL Hall of Fame tight end and the co-host of a daily sports debate show, "Undisputed," about retired NFL Hall of Fame quarterback Brett Favre and his widely-reported involvement in a Mississippi welfare fraud scandal. Favre has sued Sharpe for defamation over certain statements, and Sharpe moves to dismiss on the bases that the statements Sharpe made are protected from liability on two grounds and that Favre failed to comply with Mississippi's retraction statute. Before we address the particular arguments, some further background is in order.

**A. Welfare Fraud Scandal**

The factual backdrop of this lawsuit is one of the largest public fund fraud scandals in Mississippi history.[1] In or around October 2021, the Mississippi Office of the State Auditor

---

[1] Both parties submitted documents that go beyond the four corners of the Complaint, and neither side takes issue with the Court's consideration of such material. The Court will take judicial notice of these various documents, not for the truth of the matter asserted, but rather for purposes of background and what information was in the public sphere. *See Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008). Additionally, some materials have been

determined, based on an independent forensic audit commissioned by the Mississippi Department of Human Services, that more than $77 million dollars in federal Temporary Assistance for Needy Families ("TANF") funds had been diverted from their statutory purpose and spent illegally.[2]

This welfare scandal has resulted in significant criminal charges. To date, six individuals have pled guilty to state or federal felonies, or both, related to their involvement in the scandal, including the former Executive Director of the Mississippi Department of Human Services, four executives of non-profit organizations that received and spent welfare funds, and a retired professional wrestler.[3] While Favre has never been criminally charged, the State of Mississippi's Department of Human Services ("MDHS") filed a civil lawsuit against Favre and his company, Favre Enterprises, along with many others, seeking to recover the misspent welfare dollars.[4]

According to the State's initial complaint, filed in May 2022, Favre personally received $1.1 million dollars in TANF funds for speaking engagements that he never performed. [12-2] at ¶¶ 137-138. However, Favre had already repaid the money to the State.[5] When MDHS amended its complaint in December 2022, it alleged that Favre had not repaid an additional $5 million in TANF funds "that he orchestrated [be paid] to satisfy his personal guarantee to fund construction of the volleyball facility" and that Favre knew these were "grant funds" via alleged discussions with

---

considered because they are "integral" to Favre's claim. *See Meyers v. Textron, Inc.*, 540 Fed. Appx. 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (court considering a 12(b)(6) motion "may take into account documents incorporated into the complaint by reference or integral to the claim").

[2] *See* Press Release, Mississippi Office of the State Auditor, Auditor Demands Repayment of Misspent Welfare Money – Multiple Audits Now Confirm Millions of Dollars Intended for the Poor Were Spent Illegally (Oct. 12, 2021), https://www2.osa.ms.gov/news/auditor-demands-repayment-of-misspent- welfare-money/#more-2355. [12-1].

[3] *See* March 16, 2023 Minute Entry, *United States v. Webb*, Case No. 3:23-cr-21-CWR-FKB-1 (S.D. Miss.); March 2, 2023 Minute Entry, *United States v. DiBiase*, Case No. 3:23-cr-14-CWR-FKB-1 (S.D. Miss.); September 22, 2022 Minute Entry, *United States v. Davis*, Case No. 3:22-cr-104-CWR- FKB-1 (S.D. Miss.); April 20, 2022 Minute Entry, *United States v. New*, Case No. 3:21-cr-00028-CWR- FKB-1 (S.D. Miss.); April 20, 2022 Minute Entry, *United States v. New*, Case No. 3:22-cr-00053-CWR- FKB-1 (S.D. Miss.); *Mississippi v. McGrew*, Case No. 25CI1:20-cr-00051-AHW-1, MEC Docket Nos. 24, 25 (Hinds Co. Cir. Ct.).

[4] *See* Complaint in *Mississippi Department of Human Services v. Mississippi Community Education Center, Inc.*, *et al.*, Case No. 25 CI 1:22-cv-00286-EFP, Docket No. 2 (Hinds Cty. Cir. Ct. May 9, 2022). [12-2].

[5] [12-3] at ¶ 105 (First Amended Complaint in *Miss. Dep't of Human Svcs. v. Miss. Comm'ty Educ. Ctr., Inc., et al.*, Case No. 25 CI 1:22-cv-00286-EFP, Docket No. 197 (Hinds Cty. Cir. Ct. Dec. 13, 2022)).

others [12-3] at ¶¶ 106, 107.[6]  In short, MDHS alleged that Favre caused state welfare funds to be diverted from their statutory purpose of serving the needy and instead directed them toward building a volleyball facility for his daughter's college volleyball team.

The welfare scandal—and Favre's role in it—have generated substantial media attention. It is believed that Favre's involvement in the scandal first broke on February 27, 2020, in a *Mississippi Today* article, "Embattled welfare group paid $5 million for new USM volleyball center*.*"[7] Since then, a number of local and national news organizations have reported on the ongoing developments in the welfare scandal, including specifically Favre's involvement in it.[8]

Of particular significance here, on September 13, 2022, *Mississippi Today* published a news article discussing a recent filing in the State's lawsuit that revealed numerous text messages relating to the funding of the USM volleyball facility between Favre and Nancy New, the former president of a non-profit which received and distributed TANF funds and who has since pled guilty to state and federal criminal charges related to her role in the welfare fraud scandal.[9] The *Mississippi Today* article analyzed the recent court filing and concluded that the newly released texts "show that [Favre and others] worked together to channel at least $5 million of the state's welfare funds

---

[6] The volleyball facility was constructed at the University of Southern Mississippi ("USM"), where Favre is an alumnus and his daughter was a member of the volleyball team. [12-3] at ¶¶ 82, 83.

[7] *See* Anna Wolfe, *Former Gov. Embattled welfare group paid $5 million for new USM volleyball center*, MISSISSIPPI TODAY, Feb. 27, 2020, https://mississippitoday.org/2020/02/27/welfare- program-paid-5-million-for-new-volleyball-center/. [12-5].

[8] *See, e.g.*, *Auditor: Brett Favre Received $1.1M In Welfare Funds For Speeches He Never Gave*, CBS NEWS, May 4, 2020, https://www.cbsnews.com/minnesota/news/auditor-brett-favre-received-1-1m-in-welfare-funds-for-speeches-he-never-gave/?intcid=CNM-00-10abd1h; Ken Dilanian & Laura Strickler, *The nation's poorest state used welfare money to pay Brett Favre for speeches he never made,* NBC NEWS, Sept. 1, 2022, https://www.nbcnews.com/politics/politics-news/nations-poorest-state-used-welfare-money-pay-brett-favre-speeches-neve-rcna45871; *Former Mississippi governor helped Brett Favre obtain welfare funds for university volleyball stadium, texts show*, ESPN, Sept. 13, 2022, https://www.espn.com/nfl/story?id=34588657&_slug_=former-mississippi-governor-helped-brett-favre-obtain-welfare-funds-university-volleyball-stadium-texts-show.[12-6]. These articles are some of the publicly reported stories on Favre's involvement in the welfare scandal.

[9] *See* Anna Wolfe, *Former Gov. Phil Bryant helped Brett Favre secure welfare funding for USM volleyball stadium, texts reveal*, MISSISSIPPI TODAY, September 13, 2022, https://mississippitoday.org/2022/09/13/phil-bryant-brett-favre-welfare,. [12-7]. The article also included an image of text messages between Favre and Ms. New regarding the welfare funds. Id. at p. 4.

to build a new volleyball stadium at the University of Southern Mississippi, where Favre's daughter played the sport," and that "a separate $1.1 million welfare contract Favre received to promote the program—the subject of many national headlines—was simply a way to get more funding to the volleyball project." [12-7] at p. 3.

### B. Sharpe's Remarks Challenged by Favre

Shannon Sharpe is a retired NFL Hall of Fame tight end who currently co-hosts a daily live sports talk show on cable television with sports personality Skip Bayless, titled Skip and Shannon: Undisputed ("Undisputed"). Sharpe and Bayless are the show's hosts, providing commentary regarding recent sporting events and sports-related news for two-and-a-half hours every morning. On the episode of Undisputed that aired the day following the *Mississippi Today* article (the "Broadcast"), the hosts discussed the welfare scandal. The segment opened with moderator Jennifer Hale briefly recapping the *Mississippi Today* news article from the day before, stating: "Yesterday, an investigation by Mississippi Today found that Brett Favre, along with the help of a former Mississippi Governor, obtained welfare funds to help build a new volleyball Center at the University of Southern Mississippi."[10] The hosts then engage in a lively discussion about Favre, the scandal, and the civil lawsuit, all of which lasts approximately eleven minutes.

On February 9, 2023, Favre filed this lawsuit in Mississippi state court, and on March 20, 2023, Sharpe removed the case to this Court. Favre brings this action solely against Sharpe based on the following three statements made during the segment, as pled in the Complaint:

- "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low."
- "Brett Favre is taking from the underserved."
- "[Favre] stole money from people that really needed that money."   [1-2] at ¶¶ 1, 5, 18.

---

[10] *See* Transcript of the relevant segment of the Broadcast. [12-10] at p. 2; *see also* Video Disc of September 14, 2022 Episode of Undisputed at 00:03-00:15. [12-9].

4

**II. DISCUSSION**

In the instant Motion, Sharpe raises three grounds for dismissal. First, Sharpe contends that his comments were nothing more than rhetorical hyperbole and figurative expressions about Favre, which are protected speech that cannot support a defamation claim. Second, Sharpe argues that the Complaint fails to state a claim for defamation because Sharpe's opinions were based on disclosed and publicly reported information and official proceedings. Finally, Sharpe posits that Favre failed to comply with Mississippi's retraction statute. Because the Court finds on the first ground that the comments are unactionable, as they are mere rhetorical hyperbole, the Court need not address Sharpe's other two grounds.

### A. Legal Standard

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In particular, Rule 12(b)(6) allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. App'x 466, 470 (5th Cir. 2009) (citation omitted).

### B. Analysis

Under Mississippi law, the trial court in a defamation case must make the threshold determination of whether the language in question is actionable. *Brewer v. Memphis Pub. Co.*, 626 F.2d 1238, 1245 (5th Cir. 1980); *Hayne v. The Innocence Project*, 2011 WL 196128, at *2 (S.D. Miss. Jan. 20, 2011); *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988) ("a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit"). Courts considering a motion to dismiss a defamation claim "routinely" address "issues such as whether the statement at bar is capable of a defamatory meaning, … [or] whether it is protected opinion." *Mitchell*, 703 F. Supp. at 1258 n. 10. Dismissal of defamation suits for failure to state a claim occurs "with relative frequency." *Id*. Accordingly, it is wholly appropriate for the Court to determine on a Motion to Dismiss whether the language used is actionable.

#### 1. Applicable law regarding defamation

To state a claim for defamation, it is necessary that the defamation be "clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture." *Ferguson v. Watkins*, 448 So. 2d 271, 275 (Miss. 1984). "'[T]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.'" *Hustler Magazine v. Falwell*, 485 U.S. 46, 50–51 (1988) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503–04 (1984)).

6

"'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability." *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 126 (1970) (footnote and internal citation omitted). "[S]tatements that cannot reasonably be interpreted as stating actual facts about an individual are protected, thus assuring that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of this Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (internal citation omitted). "The threshold question [for the court] is whether the statement made was defamatory . . . whether the statement bears the meaning ascribed to it by the plaintiff and whether this meaning is defamatory." *Fulton v. Miss. Publishers Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986); *Perkins v. Littleton*, 270 So. 3d 208, 215 (Miss. Ct. App. 2018).

### 2. Whether the statements are defamatory

In his response, Favre attempts to characterize Sharpe's statements as not being those of an opinion, but of provable fact. Whether or not a statement is characterized as an opinion is no longer the relevant inquiry in light of the *Milkovich* case, which found that "an additional separate constitutional privilege for 'opinion' is [not] required to ensure the freedom of expression guaranteed by the First Amendment." 497 U.S. at 21. In other words, even an opinion can be actionable.

For example, in the *Milkovich* case, the issue was whether the author of a newspaper article, through the statements contained therein opining that the individual who was the subject of the article had lied, gave the impression that the individual who was the subject of the article had

7

committed the crime of perjury in a judicial proceeding. The Court noted that the Ohio Supreme Court had observed that "'the clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after ... having given his solemn oath to tell the truth'" and held that the language of the article was thus actionable. 497 U.S. at 21. Indeed, the Court stated, "This is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression." *Id.*

It is true that under Mississippi law, "[a] statement, even if phrased as an opinion, will not enjoy constitutional protection if the court concludes that its substance or gist could reasonably be interpreted as declaring or implying an assertion of fact." *Roussel v. Robbins*, 688 So. 2d 714, 723 (1996) (citation omitted). "The test applied by the court is whether [the statement] can be distilled to the essence of truth or falsity," or, in other words, whether the statement "can be shown to be true or false." *Mullen v. City of Grenada, Miss.*, 704 F. Supp. 2d 567, 575 (N.D. Miss. 2010). In this case, again, the statements complained of were:

- "The problem that I have with this situation, you've got to be a sorry mofo to steal from the lowest of the low."
- "Brett Favre is taking from the underserved."
- "[Favre] stole money from people that really needed that money."

The dispositive question here is whether a reasonable factfinder could conclude that the statements Sharpe made on the air would imply an assertion that Favre actually stole money from the poor. Favre contends that these statements are assertions of fact that can be proven true or false—either Favre "took money" or "stole" from "poor people" or he did not. [18] at p. 15. Favre asserts that the statements are false because he "did not steal, and has not been charged with stealing any money from anyone." *Id*. at pp. 7-8.

8

Favre further argues that Sharpe's statements and the general tenor of the segment on his show did not negate the impression that Favre committed the crime of larceny—it created that impression. *Id*. at p. 10. However, the Court disagrees. In reaching this conclusion, the Court notes that the Broadcast expressly informed viewers that Favre had not been criminally charged. [12-10] at p. 16. The Court has also, in light of case law, looked at these statements for the kind of language used and the context in which they were made and whether that would indicate to listeners that Sharpe was not purporting to state or imply an actual fact.

For example, in the *Bresler* case, *supra*, the plaintiff Bresler contended that the speakers at a public meeting, in using the word 'blackmail,' and the newspaper publisher in reporting the use of that word in the newspaper articles, were charging Bresler with the crime of blackmail, and because the petitioners knew that Bresler had committed no such crime, they could be held liable for knowingly stating a falsehood. 398 U.S. at 13. However, the Supreme Court stated:

> It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense.

*Id.* The court went on to find that the plaintiff could not recover in defamation for being accused of "blackmail" because "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.* at 13-14.

In *Nat. Ass'n of Letter Carriers v. Austin,* the plaintiffs were nonunion letter carriers who brought libel actions against local and national letter carriers' unions based on union publications labeling the plaintiffs as scabs and using the word "traitor." 418 U.S. 264, 268 (1974). The

9

Supreme Court found that plaintiffs could not recover in defamation under state law in light of federal labor law for being accused of being "traitor[s]" because it was "impossible to believe that any reader of the [newsletter] would have understood the newsletter to be charging the appellees with committing the criminal offense of treason." *Id*. at 285. The Court found, that similar to the use of the word "blackmail" in *Bresler*, the use of the word traitor was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join." *Id*. at 285-286

      Sharpe cites a number of other cases in which the courts found the particular language used non-actionable. *See, e.g., Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (television host calling plaintiff an "accomplice to murder" was nonactionable rhetorical hyperbole "expressing his belief that [plaintiff] shared in the moral culpability for [an individual's] death, not as a literal assertion that [plaintiff] had, by his actions, committed a felony"); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 908 (9th Cir. 2002) (terms "bank robber," "heist," "crime" and "theft" are nonactionable "rhetorical hyperbole."); *Montgomery v. Risen*, 875 F.3d 709, 71 (D.C. Cir. 2017) (characterization of software sold to the government as a "hoax" is too "loose, figurative or hyperbolic" to be considered defamatory); *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 (1st Cir.1992), *cert. denied,* 504 U.S. 974 (1992) (describing theatrical touring production as a "rip- off, a fraud" was not actionable defamation).

      With this and similar case law in mind, the Court also acknowledges that from the reports in the public arena after government investigations, forensic audits, civil litigation, Favre's text messages, and Favre's own implicit admission by returning $1.1 million dollars to the State, it appears to be widely believed that the money obtained by Favre for himself and USM came from welfare funds. Although the funds may have come from the State of Mississippi, such TANF funds were intended to go to poverty-stricken families, not to fund the construction of a college volleyball

facility. In that context, just as the Supreme Court has held that saying a negotiator engaged in "blackmail" or calling a non- union employee a "traitor" is constitutionally-protected rhetorical hyperbole and loose, figurative language, the Court finds that Sharpe's use of the words "steal," "taking," and "stole" in connection with Favre's actions is non-actionable speech. *See Greenbelt,* 398 U.S. at 14; *Letter Carriers*, 418 U.S. at 284-286.

Highly charged language must be viewed in its "broad context" to determine whether it would reasonably be construed in a literal sense. *See Partington v. Bugliosi,* 56 F.3d 1147, 1153 (9th Cir. 1995) ("one must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact") (citing *Milkovich*, 497 U.S. at 19). The reference to "taking" and "stole" figuratively refers to the diverting funds from the TANF for purposes other than helping the underprivileged. Similarly, Sharpe's use of the words "people that really needed that money," the "lowest of the low," and "the underserved," again are examples of protected, colorful speech referring to needy families in Mississippi.

Here, no reasonable person listening to the Broadcast would think that Favre actually went into the homes of poor people and took their money—that he committed the crime of theft/larceny against any particular poor person in Mississippi. Sharpe's comments were made against the backdrop of longstanding media coverage of Favre's role in the welfare scandal and the State's lawsuit against Favre. Listeners would have recognized Sharpe's statements as rhetorical hyperbole—robust language used to express Sharpe's strong views about the new information that emerged about Favre's participation in the welfare scandal. As any reasonable viewer can tell from watching the Broadcast, *Undisputed* is not a news outlet where viewers expect genuine initial reporting of events. It is a debate format sports entertainment talk show with lively, pointed banter, and Sharpe's comments are properly seen in that context as constitutionally-protected speech. *Cf. Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996) (sports "columnists frequently offer

11

intemperate denunciations of coaches' play-calling or strategy, and readers know this and presumably take such railings with a grain of salt").

The context in which Sharpe's remarks were made—including the tenor of the Broadcast as a whole, the format of the program and its audience, and the fact that viewers were told Favre was not charged with a crime—forecloses Favre's claim that a reasonable viewer would have thought Sharpe was actually accusing him of committing "larceny." Because Sharpe's comments are constitutionally protected rhetorical hyperbole using loose, figurative language, they cannot support a defamation claim as a matter of law.

## III. CONCLUSION

Based on the foregoing, the Court hereby ORDERS that the Motion to Dismiss [12] filed by Shannon Sharpe is GRANTED. The Complaint is dismissed with prejudice. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, a separate Final Judgment will be entered.

SO ORDERED AND ADJUDGED this 30th day of October 2023.

/s/ Keith Starrett
KEITH STARRETT
UNITED STATES DISTRICT JUDGE

12